The **ASSOCIATED GENERAL CON-TRACTORS OF AMERICA, INC., OK-LAHOMA CHAPTER–BUILDER'S DI-VISION, Plaintiff-Appellant,**

v.

**LABORERS INTERNATIONAL UNION OF NORTH AMERICA, Local 612, De-fendant-Appellee, and Laborers Interna-tional Union of North America, Inter-venor-Appellee.**

No. 10–2.

Temporary Emergency Court of Appeals.
April 12, 1973.

**1390**

Edward E. Soule, Oklahoma City, Okl. (Lytle, Soule & Emery, Oklahoma City, Okl., with him on the brief), for appellant.

Jules Bernstein, Washington, D. C. (Robert J. Connerton and Arthur M. Schiller, Washington, D. C., and Maynard Ungerman, Tulsa, Okl., with him on the brief), for appellees.

Paul T. Michael, Atty., Civ. Div., Dept. of Justice, Washington , D. C. (Harlington Wood, Jr., Asst. Atty. Gen., and William E. Nelson and William C. White, Attys., Dept. of Justice, Washington, D. C., with him on the brief), for the United States, amicus curiae.

C. W. Schwoerke, Oklahoma City, Okl., atty. for individual members of Local 612, amicus curiae.

Before CHRISTENSEN, VAN OOSTERHOUT, and ESTES, Judges.

**CHRISTENSEN, Judge.**

In connection with the Phase II program for stabilization of wages in the construction industry,[1] there has been presented here the unique questions of whether agencies charged with responsibility for requiring conformance to established standards had authority to disapprove a collective bargaining agreement in its entirety, or at all, because the wage increase it would have provided was too small rather than too large, and whether the other reasons assigned to support the agency action were collateral or otherwise so insufficient as to cast this question in no different light.

Unfortunately jurisdictional and procedural problems of first impression in the context of the Economic Stabilization Acts have complicated the case and in one respect have precluded its final disposition here. The latter problems can be properly understood only in light of the largely undisputed facts of the case and the controlling law and regulations. Indeed they become significant largely because the court below[2] failed to recognize the limitations of agency authority under the peculiar legal and factual situation involved.[3] We have elected, therefore, to reserve discussion

1. Section 203(a)(1) of the Economic Stabilization Act of 1970, 84 Stat. 799–800 (P.L. 91–379, August 15, 1970), as amended and extended by the Economic Stabilization Act Amendments of 1971, 85 Stat. 743, (P.L. 92–210, December 22, 1971) ; Exec. Order No. 11,588, 3 C.F.R. 147 (1971), as extended and amended by § 14 of Exec. Order No. 11,627, 3 C.F.R. 218, 224 (1971) ; Exec. Order No. 11,640, 37 F.R. 1213, January 27, 1972, as amended by Exec. Orders Nos. 11660 and 11674 ; Pay Board Order No. 2, Amended, filed April 24, 1972, 37 F.R. 8140.

2. Its decision is reported in Gordon v. Laborers' International Union of No. America, 351 F.Supp. 824 (W.D.Okl. 1972).

3. If the trial court's view concerning the sweeping authority of the particular agencies over the negotiation of collective

bargaining agreements had been valid, all of the procedural difficulties likely could have been surmounted and dispositive action taken here because the position of appellants below and on appeal would have presented no substantial question requiring remand for further proceedings. But should we return the case now without at least a general indication of our opinion to the contrary, a mere conformance by the trial court with the required procedure likely would leave any new judgment as questionable on the merits as the present one now appears to be. This would seem to be inconsistent with the charge to this court to "exercise its powers and prescribe rules governing its procedure in such manner as to expedite the determination of cases over which it has jurisdiction under this title. . . ." § 211(b)(1), Economic Stabilization Act Amendments of 1971.

of what ordinarily are regarded as threshold issues until later.

FACTS

The record indicates that for 25 years or more Local 612 of the Laborers International Union of North America has collectively bargained and concluded agreements with the Oklahoma Chapter —Builders' Division of the Associated General Contractors of America, Inc. (AGC), all with little or no work stoppage. The Local's parent International Union (International) has in recent years established a District Council having jurisdiction over the entire State of Oklahoma in an attempt to unify the bargaining efforts of its locals in the state. Apparently Local 612 has resisted affiliation with the District Council of the International Union, at least insofar as preserving its practice of directly bargaining with AGC. This is a problem not before us. The Local and AGC formally signed a collective bargaining agreement on March 13, 1972. International claimed before the trial court that this collective bargaining agreement was invalid because the Local was not represented by a proper bargaining agent. The trial court did not resolve this issue and we do not reach it here. The parties to the collective bargaining agreement forwarded the agreement the day of its execution to the Laborers National Craft Board (Craft Board) to obtain its approval of the wage increase of 5.5% therein provided. Upon receipt of the agreement the Craft Board's research director sent a copy of the proposed agreement to the International's general counsel along with a memorandum dated March 20, 1972, suggesting that the International take the agreement out of the hands of the Craft Board because, among other reasons, of Local's failure to negotiate through the District Council, and that certain other provisions be included in conformity with District Council policies. The Craft Board then received a letter dated March 22, 1972, from the President of the Union's District Council for Oklahoma which asserted that it, the Council, was the sole bargaining agent for all of its affiliated unions, that the agreement submitted by the AGC and the Local was invalid and that no action could be taken on it by the Craft Board. In a letter dated April 7, 1972, from the Board's management co-chairman to AGC's business manager, it was stated that the "'results of recent negotiations' between the Building Division and Local 612 . . . do not square with the current recommendations of the Craft Board insofar as the restructuring of bargaining in the State of Oklahoma is concerned." The statement continued:

"Since we are seeking the special consideration which the CISC [Construction Industry Stabilization Committee] may give to agreements which provide for significant changes in the geographical structure of bargaining, including the development of wage zones under one agreement in the firm belief such changes would promote stabilization of collective bargaining and the effective utilization of manpower and management resources, the management's side of the Laborers' Craft Board finds the joint petition from the Oklahoma Chapter and Laborers' Local 612, Oklahoma City, not in conformance with these objectives and will not look favorably on your petition."

The Craft Board, over the signatures of both co-chairmen by letter dated June 29, 1972, notified AGC's business manager that it rejected the proposed agreement for the following specific reasons:

"The proposed agreement failed to meet the Craft Board criteria for Oklahoma on the following counts. First, the agreement covers a three-year period and would stand as an absolute bar to necessary restructuring. Second, the agreement fails to narrow the economic gap between Tulsa and Oklahoma City and indeed, widens the margin. Third, we have reservations concerning the fact that no provisions have been made for welfare and pension benefits. Even though the rest of Oklahoma is covered by agreements

calling for these benefits negotiated by the Oklahoma Laborers' District Council and the Oklahoma Chapter, AGC.

"The Craft Board also raised a question concerning the representative status of the Committee purportedly representing the interests of Local Union 612."

The CISC then reviewed the Board's action and communicated its agreement therewith in a letter to the Craft Board dated July 13, 1972. Rather than submit to the agency requests to renegotiate the contract with the District Council as Local 612's bargaining agent, AGC sought judicial relief by the filing of the action below.

## THE ACTION BELOW

No. 72–544 Civil, the above-entitled case in which this appeal is being prosecuted, was commenced in the district court August 8, 1972. Without concerning itself with the trusteeship problem involved in a prior action, No. 70–520 mentioned hereafter, the complaint alleged the negotiation in good faith of "a valid collective bargaining agreement" between the AGC and the Local, the claims of others that it was "not valid and . . . binding on the defendant and its members" and prayed for a judgment declaring the contract to be valid, and for general relief. Plaintiff AGC took the position that it was not concerned with the intra-union squabble involved in the prior action and relied exclusively upon the asserted lack of authority of the Craft Board and the CISC to disapprove the collective bargaining

agreement for the reasons stated. The prior action had been filed Oct. 20, 1970 by five Local members against the Local, and certain of its officers together with the Oklahoma Laborers District Council, and sought by an amended complaint termination of a trusteeship the International had imposed upon the Local. On the grounds that the cases involved common questions of fact and law, the district court ordered their consolidation for the purposes of trial.[4]

Following trial to the court of the consolidated actions, the judgment of the trial court segregated the relief granted as between the two cases, holding as to No. 70–520 Civil that the injunction it had theretofore granted against the operation of the trusteeship in question should be dissolved and that the parties were "restored to their respective positions as of the time the preliminary injunction was issued"; as to the issues in No. 72–544 Civil (involved in the present appeal) the trial court held "that the purported contract of March 13, 1972, between Local 612 of Laborers' International Union of North America and the Associated General Contractors of America, Inc., Oklahoma Chapter—Builder's Division is void and unenforceable."

In discussing the latter action the district court observed that "it was instituted pursuant to Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, which authorizes the federal district courts to entertain '[s]uits for violation of contracts between an employer and a labor organization . . . without respect to the

4. Rule 42(a) Fed.R.Civ.P. The pleadings in No. 70–520 have not been brought before us, and we are left to gather various circumstances concerning it from the district court's memorandum decision. Nor is the transcript before us complete as to No. 70–520, portions being omitted seemingly because they related exclusively to that case. While all of the exhibits were noted as having been received for the purposes of both cases, the testimony of the witnesses was segregated to some extent between them, a portion pertaining particularly to the older case not having been admitted for the case in which this appeal was taken. In any event, we see no relationship between the earlier action and the problems now before us, since the contract in question here was entered into during a time when International's trusteeship was not yet in existence and there has been no contention made before us that the representatives of the Local were not proper agents for the negotiation of the collective bargaining agreement.

amount in controversy or without regard to the citizenship of the parties'", citing Black-Clawson Co., Inc. v. International Association of Machinists, 313 F.2d 179, 181–182 (2d Cir. 1962) as to declarations of rights. The trial court stated: "It is clear that in the instant case the task of fashioning the applicable 'common law of labor contracts,' see United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 579, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), must be undertaken in contemplation of the imposition of comprehensive economic controls over the economy by the Federal government."

The court noted that "at the time the alleged contract was signed the parties were aware that the contract was subject to review by the Laborers National Craft Board. . . ." Holding, therefore, that the contract was entered into subject to "a condition subsequent" it said that the refusal of the agencies to approve the agreement rendered the agreement of "no force and effect." Its reasoning in upholding the action of the Board and CISC was so broadly worded as to render these agencies virtual bargaining agents for the parties.[5]

## ISSUES

Aside from jurisdictional and procedural problems and the general question of the validity of the agreement to the extent this may have depended upon the identity of the union representatives negotiating it, significant issues before the trial court appear to have been:

1. Whether the Craft Board and CISC had authority to reject a negotiated agreement for a wage increase which did not exceed the "general wage and salary standard" established by the Pay Board[6], because in their judgment its

---

5. The substance of its decision in the suit before us is indicated by the following conclusions of the trial court:

"Accordingly, the court concludes that the contract was entered into by the parties subject to the condition subsequent that it be approved by the Craft Board and/or the CISC and that, by reason of their refusal to approve the agreement, it was rendered void and of no force and effect.

"The Chapter appears to suggest that this court should ignore the action of the Craft Board and CISC with respect to this contract on the ground that those agencies acted in excess of their powers. However, the court concludes that such action was wholly consistent with the authority of these agencies under the relevant legislation and regulations.

"The Court further concludes, contrary to the contention of the Chapter, that in examining and reviewing proposed collective bargaining settlements, both the Craft Board and the CISC are authorized to disapprove agreements and make recommendations with regard to bargaining subjects which go well beyond the limited area of wages. Hence Section 11(b) of Executive Order 11588 declares that '[t]he term "wage or salary" shall mean, for the purpose of this order, all wage or salary rate schedules and *economic benefits* established pursuant to a collective bargaining agreement in the construction industry.' (Emphasis added.) To adopt the notion advanced by the Chapter that the agencies are limited solely to reviewing the wage provisions of collective bargaining agreements would require the court to close its eyes to the express provisions of the control legislation and implementing orders as well as to the realities of collective bargaining in the construction industry. Hence, if the powers of these agencies were to be read narrowly, parties to collective bargaining agreements might avoid the strictures of the controls by merely concentrating on obtaining benefits outside the narrow ambit of hourly wages. But such was clearly not the intent of Executive Order 11588 nor of the other related governing regulations which sought to empower these agencies to impose effective controls upon collective bargaining in the construction industry. Indeed, in the instant case, the agencies indicated their concern regarding such bargaining subjects as fringe benefits, contract duration as well as the impact of the settlement on employment in surrounding geographical areas." (See Gordon v. Laborers' International Union of No. America, 351 F.Supp. 824, 835–836 (W.D. Okl.1972), *supra*.)

6. 6 C.F.R. § 201.10:

"Effective on and after November 14, 1971, the general wage and salary standard (hereinafter referred to as the 'standard') is established as 5.5 percent. The

terms would hinder "restructuring" of collective bargaining, provide an increase too low when wages of surrounding areas were considered, certain fringe benefits which the Board thought desirable had not been included in, or superimposed upon, the agreement of the parties, the agencies were "unsure" of the representative status of one of the bargaining parties, or for any other assigned reason.

2. Whether included in the authority of the agencies to pass upon wage increases in question was the power to reject, or to require renegotiation of, the terms of collective bargaining agreements in their entirety.

3. If the plaintiffs were found entitled to prevail on these issues and thus to be entitled to a declaratory judgment accordingly, how could a declaration of the invalidity of the agencies' rejection of the contract be rendered efficacious in view of the Executive Order provision that unless and until an increase has been approved by the agencies involved it is illegal to put such an increase into effect, and other authorized consequences to follow the certification of the agencies' disapproval by the Secretary of Labor.[7]

The foregoing issues were not insubstantial. They presented questions not resolved below nor to be avoided here in

standard shall apply to any wage and salary increase payable with respect to an appropriate employee unit pursuant to an employment contract entered into or modified on or after November 14, 1971, or to a pay practice established, modified or administered with discretion on or after November 14, 1971. Except as otherwise provided in the Regulations under this title or by decision of the Pay Board, the standard shall be used to compute the maximum permissible annual aggregate wage and salary increase. The appropriateness of the standard will be reviewed periodically by the Pay Board to insure that it is generally fair and equitable, that it calls for generally comparable sacrifice by business and labor as well as other segments of the economy and that it takes into account such factors as changes in productivity and the cost of living as well as other factors consistent with the purposes of the Act."

The general language in subdivision 201.10(c) following the quoted language, contrary to the inference drawn in the brief of *amicus curiae*, seems to us to render even clearer by its heading "Increases other than standard" and by its reference to the "Pay Board or its delegate", that the broader authority of the Pay Board over increases *within the standard* had not been delegated to craft boards or the CISC.

7. Executive Order 11588:

"Sec. 4(c) Unless and until an increase in wage or salary has been approved in accordance with the provisions of sections 3(a) and 4 of this order, it shall be a violation of this order to put such wage or salary increase into effect.

"Sec. 5. Upon a determination by a board or the Committee [CISC] that a proposed wage or salary increase is not acceptable and certification of that determination by the Secretary of Labor, the following actions shall be taken:

"(a) In implementing the provisions of the Davis-Bacon Act of March 3, 1931 (46 Stat. 1494, as amended) and related statutes the provisions of which are dependent upon determinations by the Secretary requiring similar wage standards, the Secretary of Labor and all states shall not take into consideration any wage or salary increase in excess of that found to be acceptable in making determinations under that Act and related statutes.

"(b) in order to assure that unacceptable wage rates shall not be utilized in Federal or federally-related construction, the heads of all Federal departments and agencies, subject to the direction and coordination of the Secretary of Labor:

"(1) shall review all plans for construction and financial assistance for construction in localities in which wage or salary increases have been certified by the Secretary of Labor to be unacceptable and shall, on the basis of that review, determine whether such plans can be approved or continued; and

"(2) shall review current and prospective construction contracts for Federal construction and for construction on projects receiving Federal financial assistance in the area affected by a certification by the Secretary of Labor and shall, on the basis of such review, determine whether such contracts can be awarded or continued.

"(c) The Committee and the boards shall make public their determinations,

any view that denial of relief could be summarily sustained on general principles and with the idea that all procedural difficulties could thereby be avoided in the interest of expedition. They were not subject to being brushed aside by generalizations concerning declarations of rights under a collective bargaining agreement by virtue of the Labor Management Relations Act of 1947, the restructuring of labor-management negotiations through the fashioning of an applicable common law of labor contracts, or an application of other criteria designed expressly for increases beyond the 5.5% standard or not included at all in criteria for evaluating wage increases pursuant to then existing regulations issued under the Economic Stabilization Act. To render this plain, and in an attempt to avoid abortive proceedings on remand, it is necessary to review in some detail the not uncomplicated but in reality definitive rules and regulations which are controlling in this case.

## THE REGULATORY FRAMEWORK

We must begin with a more detailed consideration of the governing statute, and the relevant orders, regulations, rulings and other administrative expressions.

The Economic Stabilization Act of 1970 (P.L. 91–379, 84 Stat. 799, Aug. 15, 1970), as amended (P.L. 92–210, 85 Stat. 743, Dec. 22, 1971), authorized the President to issue such orders and regulations as he deemed appropriate to stabilize wages and salaries at levels not less than those prevailing on May 25, 1970.

Section 1(a) of Executive Order 11640, issued January 27, 1972, provides that ". . . no person shall, directly or indirectly, pay or agree to pay, in any transaction, wages or salaries in any form, or to use any means to obtain payment of wages and salaries in any form,

higher than those permitted hereunder, whether by retroactive increase or otherwise." By § 203(b)(2) of the Economic Stabilization Act, as amended, the President was authorized to "provide for the making of such general exceptions and variations as are necessary to foster orderly economic growth and to prevent gross inequities, hardships, serious market disruptions, domestic shortages of raw materials, localized shortages of labor, and windfall profits. . . ."

In his Executive Order 11588, providing for the Stabilization of Wages and Prices in the Construction Industry, April 3, 1971, the President ordered as follows:

"Section 1(a). A Construction Industry Stabilization Committee . . . is hereby established to assure generally conformance of any increase in any wage or salary in the construction industry to the provisions of this order.

. . . .

"Section 2. Associations of contractors and national and international unions shall jointly establish craft dispute boards . . . to determine whether wages and salaries are acceptable in accordance with the criteria established in section 6 . . .

"Section 3(a). It shall be the responsibility of each board, in relation to the craft or branch over which it has jurisdiction, to provide advice and assistance in an effort to resolve any unresolved collective bargaining disputes involving wages and salaries and to promptly examine every collective bargaining agreement negotiated on or after the date of this order to determine, in accordance with the criteria established in section 6, whether wage and salary increases in the agreement are acceptable and may thus be approved. The board shall

---

specifying the craft and area affected and the wages or salaries deemed unacceptable.

"(d) Any other action authorized by law to carry out the purposes and policy

of this order shall be available to the Secretary of Labor to assure the stabilization of wages and prices in the construction industry." [This subsection revoked by Executive Order 11627.]

make determinations within a reasonable time and shall notify the parties and the Committee of action taken. When it is determined by the board that a wage and salary increase is not acceptable, the board shall also notify the Secretary of Labor.

. . . .

"Section 6. [Revoked on October 15, 1971, by Sec. 14(c) Executive Order 11627; revocation continued by Executive Order 11640; supplanted by "Substantive Policies" of Pay Board Amended Order No. 2 on April 24, 1972.]

. . . .

"Section 11(b). The term 'wage or salary' shall mean, for the purpose of this order, all wage or salary rate schedules and economic benefits established pursuant to a collective bargaining agreement in the construction industry."

Pay Board Order 2, Amended, filed April 24, 1972, some six weeks after the collective bargaining agreement was signed and submitted to the Craft Board, authorized CISC to administer pay board regulations applicable to collective bargaining agreements in the construction industry, and to administer the CISC "Substantive Policies" which were submitted to replace the criteria in Section 6, Executive Order 11588. Those relevant to this case include the following:

"(2) No agreement is automatically entitled to the 'general wage and salary standard' [5.5% annual increase] or the exceptions thereto of the Pay Board. Moreover, the application of equal percentage adjustments to all crafts in any locality is often not a practical basis for stabilization; on occasion cents-per-hour developments among some or all crafts may be more appropriate.

"(3) Pending final resolution of treatment of fringe benefits exempt under section 203(g) of the Economic Stabilization Act Amendments of January 9, 1971, these benefits, together with all other benefits, will be considered in determining economic adjustments subject to the review of the CISC.

"(4) In the application of exceptions in individual cases providing for adjustments in excess of the 'general wage and salary standard,' the following principles are to be applied:

. . . .

"(c) In general, any restoration to appropriate historic relationships among crafts or localities should be spread over a period of 2 or 3 years or more. The CISC in reviewing historical relationships will also give attention to clear evidence of changing historical relationships over the past decade.

. . . .

"(e) The CISC may give special consideration to agreements which provide for significant changes in the geographical structure of bargaining, including the development of wage zones under one agreement, where such changes would promote the stabilization of collective bargaining and the effective utilization of manpower and management resources.

. . . .

"(6) In the consideration of all applications in 1972, the CISC recognizes the necessity to show continued retardation in the rate of increases permitted for 1972 as measured by Pay Board standards. The CISC shall also apply this principle to agreements extending into 1973 and 1974.

"(7) The CISC is to continue to apply its policy on economic adjustments which are broader than wages and fringe benefits, that is, which would include the money value of all economic adjustments including work rules.

"(8) The CISC is to seek to improve the role of the craft boards and to enhance their contribution to the improvement of collective bargaining and procedures for dispute settlements in the industry."

Provisions contained in 29 C.F.R. Part 2001, in effect as of January 1, 1972, add little more light to the role of the craft boards, although the provisions of § 2001.30 appear to be based on Section 6 of the Executive Order 11588, which section was revoked on Oct. 15, 1971, by Executive Order 11627:

"§ 2001.5 Jurisdiction.

"Each such [craft] Board shall have jurisdiction, with respect to wage and salary increases negotiated or being negotiated in the appropriate craft or branch in any locality—

"(a) To provide advice and assistance in an effort to resolve any unresolved collective bargaining disputes involving wages or salaries; and

"(b) To consider and determine, subject to the provisions of the Executive order and this part, whether the wages and salaries provided in any labor contract negotiated for the craft or branch are acceptable in accordance with the criteria set forth in § 2001.-30.

. . . .

"§ 2001.30 Acceptability of wage or salary increases.

"Determinations by a Board as to whether any wage or salary increases are acceptable shall be based on the following criteria and these criteria will be applied by the Committee in reviewing any matters before it:

"(a) Acceptable economic adjustments in labor contracts negotiated on or after March 29, 1971, will be those normally considered supportable by productivity improvement and cost of living trends, but not in excess of the average of the annual median increases in wages and benefits over the life of the contract negotiated in major construction settlements in the period 1961 to 1968. . . .

"(b) Equity adjustments in labor contracts negotiated on or after March 29, 1971 may, where carefully identified, be considered over the life of the contract to restore traditional relationships among crafts in a single locality and within the same craft in surrounding localities."

Thus, all wage and salary increases and related economic adjustments in the construction industry required the approval of CISC and the appropriate craft board. The validity of these regulations has not been questioned. Nor can it be gainsaid that no agreement had automatic entitlement to the 5.5% standard. Yet agreements within the 5.5% standard were not properly subject to all of the criteria applicable to higher increases, and CISC and the craft boards had general advisory and assistance functions which were not wage increase criteria at all except to the extent that they might lend dimension and symmetry to the criteria specified. The agency appears not only to have applied unauthorized criteria to the collective bargaining agreement in question but to have parlayed its advisory and assistance functions virtually into bargaining authority. And it seems to have utilized its extended powers to reject the agreement as a whole because it was not properly negotiated [8], among other criticisms,[9] notwithstanding that its

---

8. To uphold the Board's action on this basis could create in principle a jurisdictional conflict with the National Labor Relations Board, which expressly provides for resolution of agent and unit disputes in its Rules and Regulations: "Procedure under Section 9(c) of the Act for the Determination of Questions Concerning Representation of Employees and for Clarification of Bargaining Units and for Amendment of Certifications Under Section 9(b) of the Act," 29 C.F.R. Part. 102, Subpart C. Refusal to sign an agree-

ment when one has been reached by appropriate representations may itself be an unfair labor practice. See H. J. Heinz Co. v. N.L.R.B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309 (1941).

9. Both counsel for the International and for the government stated their belief, upon query from the bench, that even though a collective bargaining agreement contained a wage increase lower than the standard it could be rejected by the Board on grounds that it should have been

main objection to the wage increase specifically appeared to be that it was too little rather than too much.[10]

Executive Order No. 11588 established CISC "to assure generally conformance of any increase in any wage or salary in the construction industry to the provisions of this order." (Sec. 1(a).) The craft boards were to be established "to determine whether wages and salaries are acceptable in accordance with the criteria established in section 6." (Sec. 2.) While each board, in relation to the craft or branch over which it had jurisdiction was given responsibility "to provide advice and assistance" in an effort to resolve any unresolved collective bargaining disputes involving wages and salaries, beyond this advisory and assistance function and separate from it, each was charged with the additional responsibility "to promptly examine every collective bargaining agreement . . . and to determine in accordance with the criteria established in Section 6, whether wage and salary increases in the agreement are acceptable and may thus be approved." We make no point of the absence of any specific criteria because of the revocation of Section 6 of Executive Order No. 11588 and the nonexistence of its replacing Pay Board Order at the particular time the agreement in question was executed and submitted. We shall assume that it was reasonable to apply criteria expressed thereafter and in existence at the time of the Craft Board ruling.[11] (Sec. 3(a).) But one will search in vain to find in Section 6 the inclusion among the criteria referred to of the advisory and assistance functions of the boards. Nor is there to be

accompanied by other provisions or should have been negotiated by other collective bargaining agents; and counsel for International flatly argued that for insufficiency of an increase alone the Board had power to reject a collective bargaining agreement.

10. See letter of April 7, 1972, from the Board's management co-chairman, and letter of June 29, 1972, from the full Board to AGC setting out specific reasons for the Board's action, cited at pages 4 and 5, *supra;* also note 15, *infra.*

11. In Section 3(a) of Executive Order 11588 it is declared to be the responsibility of the boards to "provide advice and assistance in an effort to resolve any unresolved collective bargaining disputes involving wages and salaries" *and* to promptly examine every collective bargaining agreement in accordance with the criteria of section 6. Section 6 was revoked on October 15, 1971, by Executive Order 11627 and the Substantive Policies of the CISC, contained in Pay Board Order No. 2, Amended, were, by their own terms, to "constitute a complete substitute for the standards set forth in sections 6(a) and (b) of Executive Order 11588. . . . " Substantive Policy 4 lists principles to be applied in ruling on exceptions in individual cases providing for *adjustments in excess of the standard* and of these, 4(c) and 4(e) would involve CISC in collective bargaining. Policy No. 4(c) authorizes CISC to become involved in restorations to appropriate his-

toric relationships; 4(e) instructs CISC to give special consideration to agreements which provide for significant changes in the geographical restructuring of bargaining. Substantive Policy 8 empowers CISC to seek to enhance the boards' contribution to the improvement of collective bargaining and procedures for dispute settlement in the industry. Section 6 of the Executive Order 11588, replaced by these Substantive Policies, listed as criteria to be applied in determining acceptability of wage and salary increases, certain acceptable economic and equity adjustments, without reference to the boards' involvement in collective bargaining. There is no indication that the role of the boards in resolving collective bargaining disputes involving wages and salaries (Executive Order 11588) corresponds to the role of the boards suggested in Substantive Policy 8 of contributing to the improvement of collective bargaining, although the provisions of the executive order restricting the boards' involvement in collective bargaining disputes to those "disputes involving wages and salaries" would seem naturally to govern any provisions of the Pay Board order. A further complication arises in the fact that the Substantive Policies were not filed, and presumably did not become effective, until March 24, 1972, well after the contract was submitted for examination but before the Board issued its official rejection, and that Section 6 had been revoked on October 15, 1971.

found in the replacement Pay Board Order No. 2 any transformation of these advisory and assistance functions into criteria for approving or disapproving proposed wage increases within the 5.-5% standard.

With reference to increases beyond the "standard 5.5%", the boards were granted power to consider restorations to appropriate historical relationships among crafts and agreements providing for significant changes in the geographical structure of bargaining. But as to increases within the standard the CISC and the Boards were directed to consider only whether insufficient retardation in the rates of increase[12] or other economic adjustments in the agreement[13] justified rejection of an increase. There is no contention that there were other economic benefits in the agreement that represented an increase in addition to wages. In fact, one of the objections of the Craft Board was that fringe benefits were not included. Nor is there a record of any objection, except as an afterthought expressed at the trial by a representative of the Craft Board, going to the question of rate of increase retardation. Even there the objection was directed to

the three-year term of the contract rather than to any consideration of the wage rate as such.[14] Not only did the Board apparently fail to consider this point but its concern about widening the gap between Tulsa and Oklahoma City indicated its desire to see the contract provide for larger successive increases rather than smaller.[15]

We are mindful of the broad delegation of power to the President for the purposes of economic stabilization and the broad redelegation of power that has occurred in other contexts.[16] But neither the President nor the Pay Board delegated to the agencies involved here any such general power to establish criteria different than those specified and hereinbefore discussed for disapproving pay increases within the standard of 5.-5%. It is neither a narrow nor a grudging construction to draw distinctions clearly delineated by controlling regulations, nor did the agencies have license to disregard them. According the powers of the agencies their full effect and recognizing related powers reasonably to be implied therefrom, there was nothing in the agency ruling of record from which the trial court could have properly concluded that they acted with-

12. Substantive Policy No. 6: "In consideration of all applications in 1972, the CISC recognizes the necessity to show continued retardation in the rate of increases permitted for 1972 as measured by Pay Board standards. The CISC shall also apply this principle to agreements extending into 1973 and 1974."

13. Substantive Policy No. 7: "The CISC is to continue to apply its policy on economic adjustments which are broader than wages and fringe benefits, that is, which would include the money value of all economic adjustments including work rules."

14. Mr. Paul B. Richards, management co-chairman of the Craft Board testified in response to a series of questions about the Board's ruling on the element of retardation in the submitted agreement: "I explained to you, Counsellor, I did not vote on the basis of the wages before me, but on the basis of the general principles presented by the contents of that contract." See also further testimony of Mr.

Richards on the reasons for the Board's action quoted at footnote 18, *infra.*

15. As revealed in the record the wage increases proposed in the agreement at issue here brought the current rate of $4.03 up to $4.25, effective June 1, 1972; to $4.50, effective June 1, 1973; and to $4.75, effective June 1, 1974, each increase amounting to approximately 5.5%. In Tulsa, the current rate in 1971 of $4.55 (an increase of 9.6% over 1970) was increased to $4.65 in 1972. Approved increases for Lawton and Stillwater locals for 1972 amounted to 18% and 17%, respectively.

On oral argument it was represented without contradiction that the Tulsa contract was submitted to the Board after submission of the Oklahoma City contract and approved as to its proposed increase before the Board took action on the Oklahoma City agreement.

16. See U. of So. Calif. v. Cost of Living Council, 472 F.2d 1065 (Emm.App. 1972).

in their powers or other than arbitrarily. The Court in appropriate proceedings and with the necessary parties before it must set aside board decisions which rest upon erroneous legal foundations; and misapplication of criteria governing board actions may comprise an insufficient foundation.[17]

■ The undisputed evidence before the district court threw no different light upon the rulings and indeed reinforced the conclusion that the controlling reasons for disapproving the contract were beyond the criteria delimiting the authority of the boards.[18] The trial court's opinion rested upon a similar erroneous basis and in its failure, shared by the agencies, to draw a distinction in criteria between increases within and in excess of the standard established by the Pay Board. The great deference to which administrative interpretations ordinarily are entitled [19] may not prevail over misapplications of the nature indicated.[20]

17. See N.L.R.B. v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965).

18. In his testimony, Dr. Richards, management co-chairman of the Board said, among other things:

"Q. Tell us, please, Mr. Richards, exactly what the objection is that your Board finds with this contract.

"A. Well, I expressed my objections for the management members of the Board, as expressed to Mrs. Leslie [AGC business manager] April 7, 1972—

. . . . .

"A. The basic objection is that it is a long term agreement.

. . . . .

"Q. What are your other objections?

"A. The other objections are basically that you don't have a uniform welfare and pension system in the state. There is not a master agreement for all the Laborers' Locals in the state, and there are many bargaining elements rather than a single bargaining element for a single trade in the state.

. . . . .

"A. We disapproved for a number of reasons, one of which went to the question of the state-wide pension, health and welfare.

"Q. What are the other reasons you turned it down?

"A. I explained to you that we turned it down on the basis of its length of term.

"Q. Is there any other reason?

"A. The management side of the Board thought that it did not exhibit retardation, as mandated by the policy of the Construction Industry Stabilization Committee.

. . . . .

"A. Well, let me go back in history. We had looked over the state of Oklahoma far prior to this case coming before us, and the Craft Board had considered this a state where restructuring should take place, and they had come up with a plan for the restructuring of Oklahoma within the terms and framework of the Executive Order.

"The fact is that Local 612 agreement did not meet that plan, and therefore it was rejected on basis it did not meet the restructuring program and the plan of the Laborers' National Craft Board.

. . . . .

"Q. Then this case went to that Board [CISC]. Did they hear any new evidence of any kind?

"A. No, sir, as I explained now several times, the Laborers' National Craft Board did the courtesy to the CISC of providing a copy of our rejection letter to the AGC and 612."

19. Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); United States v. International Brotherhood of Electrical Workers, Local No. 11, 475 F.2d 1204 (Em.App. (1973); Univ. of So. California v. Cost of Living Council, 472 F.2d 1065 (T.E. C.A.1972), cert. denied, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973); United States v. Lieb, 462 F.2d 1161 (Em.App.1972).

20. N.L.R.B. v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965) *supra*; Atchison, T. & S. F. Ry. Co. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273 (1932); Conklin Pen Co. v. Bowles, 152 F.2d 764 (Em.Ct.1946); Federal Trade Commission v. Crowther, 139 U.S.App.D.C. 137, 430 F.2d 510 (1970); Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F. 2d 859 (1970); In re Hooper's Estate, 359 F.2d 569 (3d Cir.), cert. denied, Marine National Exchange Bank, Executor v. Government of the Virgin Islands, 385 U.S. 903, 87 S.Ct. 206, 17 L.Ed. 2d 133 (1966). In the latter case it is noted that "administrative action is arbitrary if it is taken without any au-

■ What we have said about the agencies' authority applies to that authority existing at the time of the rulings in question. We are mindful that in Phase III of the stabilization program the general powers of the CISC have been broadened and emphasized.[21] We indicate no view as to what effect these new provisions might have had if they had been in force at some pertinent time, nor as to their possible effect during Phase III. Nor do we consider the related question of whether the new provisions would be within the authorization of the Economic Stabilization Acts themselves were they to be extended to the enforced regulation of collective bargaining conditions apart from economic factors. As this court heretofore has noted in a different case [22] we do not consider that the changes in the regulations should somehow influence our judgment as to the application of prior ones since here, even more than there, it is likely "that a justifiable change in policy considerations brought .about the . . . alterations."

## JURISDICTION—SUFFICIENCY OF PLEADINGS

■■ The complaint in the district court alleged that jurisdiction existed by virtue of 29 U.S.C. § 185,[23] and the trial

thority of law or upon a misconstruction of the *statutory authority* under which it purports to act." Notwithstanding the general exclusion by Section 207 of stabilization functions from the operation of the Administrative Procedure Act with certain exceptions primarily relating to the issuance of regulations, the power of the court to correct arbitrary action is implicit in Section 211(d)(1), *Economic Stabilization Act Amendments* of 1971, 85 Stat. 743 (P.L. 92–210, December 22, 1971).

21. The basic executive authorization for Phase III, Executive Order 11695, January 11, 1973, continues the CISC and the boards as before, with the added provisos that they shall perform "such functions with respect to the stabilization of wages and salaries in the construction industry as the Chairman of the [Cost of Living] Council may delegate to [them]." (Sec. 5.) On that same day, Cost of Living Council Order No. 16 made a Delegation of Authority to CISC, charging it in carrying out its functions to "give particular attention to improving the collective bargaining process in the construction industry and to the rationalization of the wage structure within geographic areas and between crafts within a particular area." And a White House Fact Sheet released to accompany Executive Order No. 11695 states that the CISC "will continue its work with the twin goals of improving the bargaining structure in the industry and achieving additional progress in bringing the rate of growth in this sector into line with the general wage growth in the economy."

Cost of Living Council Release No. 213, February 26, 1973, states that "[t]he fundamental objective of policy for the 1973 collective bargaining season is to move toward viable long-run arrangements for dispute settlement in each branch of the industry and toward more effective collective bargaining in the public interest." It continues:

"The period of controls, as envisaged in Executive Order 11588, should be used to make a major contribution to the resolution of some of the major longer-term problems of the industry through effective cooperation between labor, contractors and the government. Among the most significant of these long-run problems has been: (a) the need for procedures at the national level to facilitate the settlement of disputes over the terms of local or regional collective bargaining agreements, (b) broadening the geographical structure of negotiations in some localities and for some crafts, (c) development of special wage rates for some branches of the industry, (d) review of some managerial and labor practices and contract provisions in some localities as they affect costs, (e) greater coordination of collective bargaining negotiations among crafts and associations in some localities, and (f) improvement in the quality of information available for collective bargaining among local and national parties."

It is clear from these documents that the delegation of authority to CISC during Phase III includes a clear mandate to make improvement of collective bargaining a "fundamental objective."

22. Univ. of So. Calif. v. Cost of Living Council, 472 F.2d 1065 (Emm.App.1972).

23. "(a) Suits for violation of contracts between an employer and a labor organ-

court agreed. Our jurisdiction is derivative through that of the district court and it is the court's duty to assure itself of its own jurisdiction as well as that of the trial court.[24] The jurisdictional foundations of the case as initially laid in the complaint did not expressly involve matters within this court's appellate jurisdiction. Aside from the question of the validity of the Craft Board's action it may be assumed that the issues of whether the validity of the entire collective bargaining agreement was subject to a "condition subsequent" as a matter of contract, and whether the agreement as such was invalid because negotiated by improper union representatives, were within the reach of jurisdiction afforded to the district court by the Labor-Management Relations Act.[25] The controversy between the parties which was ultimately adjudicated by the

trial court involved the validity of agency orders issued in reliance upon regulations under the Economic Stabilization Act as amended. As to the latter problem our jurisdiction is clear except for the question of pleadings, since the case as presented to the trial court and decided by it arose under the Act and its regulations.[26] We need not pause to consider any theory of pendant jurisdiction in the present context since if the allegations of jurisdiction in the complaint are inaccurate or incomplete for their reference solely to the Labor-Management Relations Act, they may be deemed amended to refer to the provisions of the Economic Stabilization Act in conformance with the proof, and our jurisdiction thus sustained of record.[27]

■ Another pleading difficulty arises from the fact that the action below was filed obviously as a friendly

ization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

24. See, e. g., Buell v. Sears, Roebuck and Co., 321 F.2d 468 (10th Cir. 1963).

25. The trial court seems to have based its decision at least in part upon the application of such a condition-subsequent-by-contract theory which now appears unwarranted; however the gist of its determination was that the refusal of the agencies to approve the agreement, including the pay increase, was within their authority and thus valid. In any event such problems and the question of whether a collective bargaining agreement has been validly entered into in the first instance have been held to be so related to the subject of "suits for violation of" labor contracts as to permit their resolution by district courts by virtue of § 185 notwithstanding their relationship to possible unfair labor practices within the exclusive cognizance of the Labor Relations Board. See United Steelworkers of Am., AFL-CIO v. Rome Indus., Inc., 437 F.2d 881 (5th Cir. 1970) ; Warrior Constructors v. International U. of Op. Eng., Local 926, 383 F.2d 700 (5th Cir. 1967) ; Heavy Cont'rs Ass'n v. International Hod Car., L. No. 1140, 312 F.Supp. 1345 (D. Nebr.1969) ; Lewis v. Splashdam By-Products Corporation, 233 F.Supp. 47

(W.D.Va.1964) ; Todd Shipyards Corp. v. Industrial U. of Marine & Ship Wkrs., 232 F.Supp. 589 (E.D.N.Y.1964).

26. Economic Stabilization Act Amendments of 1971, § 211, Judicial Review:
"(a) The district courts of the United States shall have exclusive original jurisdiction of cases or controversies arising under this title, or under regulations or orders issued thereunder, notwithstanding the amount in controversy . . . ."

27. Fed.R.Civ.P. 15(b) Amended and Supplemental Pleadings: Amendments to Conform to the Evidence:
"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. . . . ."
28 U.S.C. § 1653:
"Amendment of pleadings to show jurisdiction.
"Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."
Cf. United States v. Lieb, 462 F.2d 1161, 1168 (Emm.App.1972).

suit, both the AGC and the Local joining during the proceedings in the position that the action of the Craft Board and CISC in rejecting their contract was unauthorized and void. The allegations in the complaint concerning a case of actual controversy within the purview of the Declaratory Judgment Act are exceedingly questionable for sufficiency; and until the International intervened the adversary nature of the proceedings was most dubious. There is no question, however, that after that intervention the case became highly adversary and that it became on the issues there drawn and developed among the parties and now argued here with the assistance of *amicus curiae* a case or controversy entitled to treatment as such within the contemplation of the statute.[28] Again, the pleadings may be deemed amended and supplemented in conformance with the proof, to set aside any question of their insufficiency.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

In City of New York v. New York Telephone Company, 468 F.2d 1401 (Emm.App.1972), Chief Judge Tamm, speaking for this court, considered the necessity of the exhaustion of available administrative remedies before resort to the courts in cases arising under the Economic Stabilization Act of 1970, as amended. It was recognized that unlike its predecessors the Emergency Control Act of 1942 and the Defense Production Act of 1950, the present system shifts "some of the emphasis from the administrator to the district court in the development of factual issues." Yet in considering the later acts and their legislative history the conclusion was

reached that the exhaustion requirement fully extended into this area unless administrative remedies were found to be inadequate on a case by case basis. The opinion concluded:

"It is clear to us that there is an adequate administrative remedy here which must be pursued initially. Should we find the administrative remedy inadequate in the context of a particular factual situation or circumstance, we shall not hesitate to speak up. As the Congress has built the Economic Stabilization skeleton, and as the Executive has put some regulatory meat on its bones, so we too must fulfill our constitutional duty of breathing life into this golem-like creature, for it is all too clear that judicial review of esoteric questions involving the economy of a nation can only be meaningful where the administrative review is meaningful." (468 F.2d at p. 1406.)

■ We find in the present case that to the extent administrative remedies may not have been exhausted they were inadequate to preclude recourse to the district court. Administrative review of the Craft Board decision by CISC was contemplated and, indeed, accomplished but was not meaningful because of the summary approval of the Craft Board ruling by CISC through application of the unauthorized criteria. Unlike the system of agency adjudication involved in City of New York v. New York Telephone Company, *supra*, in which review of price decisions was contemplated and actually in progress at the time suit was initiated in the district court,[29] no provision had been made in the construction wage context for administrative review of CISC decisions, which were to be

---

28. 28 U.S.C. § 2201:
   "In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."
   See International Longshoremen's Association, AFL-CIO v. Seatrain Lines, Inc., 326 F.2d 916 (2d Cir. 1964).

29. 468 F.2d at 1403–1406.

treated as effective and implemented forthwith.[30]

We find this situation to invoke an exception to the general rule of *City of New York* and contemplated thereby. Accordingly, we hold that recourse to the district court was not precluded by the exhaustion rule, and the conclusion of the case on the basis of the existing administrative record, and in light of evidence before the trial court is proper.[31]

We have here an example of how an Economic Stabilization Act case within our appellate jurisdiction can become needlessly complicated, its expedition frustrated and controlling issues masked: Jurisdiction was laid under a statute not applicable to the principal controversy before us; the original parties were not shown actually to have been in an adverse position respecting the issue of the validity of agency action; the original pleadings did not adequately disclose this issue; the consolidation of the case with another having only a tangential relationship and invoking the appellate jurisdiction of another court further obscured the issues and complicated review; the relief specifically requested, a declaration of the validity of the collective bargaining agreement in question as between the parties, did not come to grips with the problem as to which the judgment of this court is now sought—the absence of an affirmative order of the Craft Board accepted by CISC approving the pay increases provided in that agreement; and, finally, failure to name as parties the agencies which had refused such an order and whose approval (or its equivalent) was requisite to collection of the increased pay under the agreement however valid that agreement may have been otherwise as between the parties.

We do not assume to criticize the parties, much less the court, for these irregularities [32] for likely with no prior exposure they were dealing with a unique legislative and executive creature, borrowing Judge Tamm's metaphor, whose functioning in judicial context there still has been limited opportunity for us to delineate and none heretofore from the trial procedure standpoint. Even though in the interest of expedition and in view of the circumstances

---

**30.** On the contrary, Executive Order 11588 dated March 15, 1971, Section 5, authorized the immediate implementation and enforcement by the Secretary of Labor of any "determination by a [craft] board or the [Construction Industry Stabilization] committee that a proposed wage or salary increase is not acceptable. . . . ." That the omission of provision for any administrative review of CISC decisions was not an oversight is plainly shown by Cost of Living Council Order No. 22 effective March 1, 1973, which provides for a review or reconsideration of initial decisions regarding pay adjustments, but which expressly provides that "[t]he authority delegated in this Order shall not include any authority which has been delegated to the Construction Industry Stabilization Committee pursuant to Cost of Living Council Orders Numbers 16 and 20 or to the Administrator for Pay Board Matters pursuant to Cost of Living Council Order Number 21. A similar exception was contained in Cost of Living Council Order No. 16 providing authority for the Administrator for Pay Board Matters

to rule on requests for review or reconsideration in the period of transition of authority between Phases II and III.

**31.** *Cf.* Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859, (1970) ; Koepke v. Fontecchio, 177 F.2d 125 (9th Cir. 1949).

**32.** We do not find that any of these problems were called to the attention of the trial court and, in fact, counsel for the parties in their arguments before this court indicated satisfaction with the procedural and jurisdictional posture of the case and inferred that we were in a position to finally dispose of the case on its merits one way or the other. The government as *amicus curiae* stated in its brief that "the record is adequate to support the district court decision [but] if this court feels that the record is inadequate in this regard, the case should be remanded for further proceedings so that the Government can be made a party to the suit." It is in view of this failure to raise the points below that we have gone as far as feasible to avoid having our decision turn upon them.

mentioned above and in the margin we have been able, and considered it proper, to surmount most of these insufficiencies, we must not fail to emphasize that similar forbearance may not be forthcoming or even possible in future cases, so that counsel seeking prompt decisions on the merits may not be ensnared. However, we have been unable to scale one procedural obstacle without sacrificing an essential principle or confronting an impasse of remedy, to which we now turn.

## ABSENCE OF THE AGENCIES AS PARTIES

As heretofore observed, neither the CISC nor the Craft Board was made a party to these proceedings. Enough already has been stated to make plain that a serious question concerning the validity of the agency action precludes bypassing problems of remedy by affirmance of the trial court's judgment. On the other hand, however, as obvious as the invalidity of agency action might otherwise appear, a final disposition here to this effect would be clouded by lack of opportunity for the agencies as parties to be heard before the district court and by the prospective ineffectiveness of any declaratory judgment pronouncing the collective bargaining agreement valid between the parties whereas the real problem, if there is ultimately determined to be merit in plaintiff's position, is the failure of the Craft Board or CISC to affirmatively approve the pay increase therein provided. Granted that any final declaratory judgment could be implemented or enforced by proceedings supplemental to that judgment, this would be possible only as between the parties.[33]

In this particular case there are certain factors which appear to minimize the importance of agency joinder and which may have led to the overlooking of the problem heretofore. The statutory provisions for intervention and review, while referring to plaintiffs in various contexts, contain no express designation of parties defendant;[34] functions exercised under the Economic Stabilization Act in proceedings involving the validity of orders as distinguished from regulations are excluded from the operation of the various provisions of the Administrative Procedure Act;[35] the agency action in question was completed and any alteration *pendente lite* even though the agencies were parties could have been deemed improper;[36] in connection with other special regulatory systems adjudications concerning the validity of agency determinations have

---

33. 28 U.S.C. § 2202: "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

34. Economic Stabilization Act Amendments of 1971:

"§ 209. Whenever it appears to any person authorized by the President to exercise authority under this title that any individual or organization has engaged, is engaged, or is about to engage in any acts or practices constituting a violation of any order or regulation under this title, such person may request the Attorney General to bring an action. . . .

"§ 210(a). Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States. . . .

"§ 211(a). The district courts of the United States shall have exclusive original jurisdiction of cases or controversies arising under this title. . . .

"§ 211(d)(2). A district court of the United States or the Temporary Emergency Court of Appeals may enjoin temporarily or permanently the application of a particular regulation or order issued under this title to a person who is a party to litigation before it. . . ."

35. §§ 207(a) and 211(d)(1) of Economic Stabilization Act Amendments of 1971, *supra.*

36. See United States v. McCrillis, 200 F. 2d 884 (1st Cir. 1952); Senderowitz v. Clark, 162 F.2d 912 (Emm.App.1947).

been conducted without joining the agencies themselves as parties;[37] and in a couple of cases decided by this court accepting or otherwise considering the effect of agency action neither the United States nor the agencies were parties.[38] The revision to Rule 19, Fed.R.Civ.P., ameliorates the old "indispensable party" concept as a jurisdictional immutable and permits actions to proceed in the absence of desirable parties to a practical extent.[39] The intervention of the International which provided fifty percent of the Craft Board's membership, the appearance of a member of the Craft Board as a witness before the district court, and the appearance here of the United States as *amicus curiae* afford indication that we have had the benefit of the agency viewpoint. Yet none of these considerations persuades us that this case can be disposed of without remand. There are obvious distinctions between this case and cases cited in the margin arising under other statutes providing for specific types of review, some by contract. The cases previously in this court as noted have not involved a declaration of the invalidity of agency orders or they have included the United States as party plaintiff.[40] Absence from the Economic Stabilization Act Amendments of 1971 of express provision for the joinder in appropriate cases before the district courts of officers or agencies whose orders are in question is of no significance since such requirement is a general and fundamental one applicable alike here and to proceedings under the Administrative Procedure Act which also contains no express requirement in this respect.

■■■ While the agencies in this case may not be regarded as being indispensable for every purpose so as to have required dismissal of the action in their absence, they should be made parties by reason of subdivision (a)(1) of Rule 19 before this litigation can be concluded.[41]

37. *See, e. g.*, Templeton v. Atchison, T. & S. F. Ry. Co., 84 F.Supp. 162 (W.D.Mo. 1949), affd. Brotherhood of Railroad Trainmen v. Templeton, 181 F.2d 527 (8th Cir. 1950); Edwards v. Capital Airlines, Inc., 84 U.S.App.D.C. 346, 176 F.2d 755 (1949); Western Fruit Growers, Inc. v. Beilman Produce Co., Inc., 75 F.Supp. 334 (M.D.Pa.1948). See also Order of Ry. Conductors of America v. Penn. R. Co., 323 U.S. 166, 65 S.Ct. 222, 89 L.Ed. 154 (1944); Transport Wkrs. U. of Amer. v. Amer. Airlines, Inc., 413 F.2d 746 (10th Cir. 1969); Kansas Gas & Electric Co. v. City of Independence, Kansas, 79 F.2d 32 (10th Cir. 1935).

38. McGuire Shaft & Tunnel Corp. v. UMW Local 1791, 475 F.2d 1209 (Em.App. 1973); City of N. Y., v. N. Y. Telephone Co., 468 F.2d 1401 (T.E.C.A.1972), *supra.* However, these did not involve challenge to the validity of agency action."

39. "Rule 19—Joinder of Persons Needed for Just Adjudication
"(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties. . .
"(b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. . . ."
See Provident Bank v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968), reversing Provident Tradesmens B. & T. Co. v. Lumbermens Mut. Co., 365 F.2d 802 (3d Cir. 1966).

40. *See, e. g.*, United States v. IBEW Local 11, 475 F.2d 1204 (Emm.App.1973); United States v. Chicago Blackhawk Hockey Team, Inc., 468 L.Ed.2d 221 (Emm.App.1972).

41. *Cf.* Order of Railway Conductors of America v. Pa. R. Co., 323 U.S. 166, 65 S.Ct. 222, 89 L.Ed. 154 (1944). The agency rulings of course have been established, but the agencies as parties should be afforded reasonable opportunity to explain them before the district court in any light they believe would be consistent with their validity; and upon the determination of validity or invalidity by the

To further breathe life into the legal system with which we are concerned and as a correlative of the principle applied in *City of New York* [42] we hold that in the absence of equivalent representation or other extraordinary circumstance which we cannot now anticipate no order of an economic stabilization program agency should be mandated or subjected to invalidation in any judicial proceedings unless that agency has been made party to such proceedings.

In furtherance of a simplified and expeditious procedure we consider

that the Laborers National Craft Board and the Construction Industry Stabilization Committee may be joined as such without naming the individual members.[43] The public treasury not being involved, the United States as such and the persons and agencies through which agency authority was delegated do not appear indispensable since there has been left to the agencies named full decisional responsibility.[44]

Reversed and remanded for further proceedings not inconsistent with this opinion.

---

district court they manifestly should be heard as to the form of the declaration and any supplemental relief that might be necessary to effectuate the judgment.

42. 468 F.2d at pp. 1402–1406.

43. In two other cases in this court agency action has been challenged and the United States has not been a party. In each the defendants apparently were sued as agencies rather than as individual members comprising the agencies. Univ. of So. Calif. v. Cost of Living Council, 472 F.2d 1065 (Emm.App.1972); Mass Retailing Institute, Inc. v. Cost of Living Council, 468 F.2d 948 (Emm.App.1972). While the distinction between suing an agency officer and his agency may be important for some purposes, such as proper service of summons, Fed.R.Civ.P. 4(d)(1) and (5), avoidance of sovereign immunity, the assertion of personal liability, etc., such a distinction need not be controlling in this case in the absence of developing practical difficulties of which prospect we are not now aware. The precedents already established satisfy us that agency intervention is practical through participation by attorneys for the Department of Justice as in prior cases.

44. The key principle was framed in Williams v. Fanning, 332 U.S. 490, 68 S.Ct. 188, 92 L.Ed. 95 (1948): "The superior officer is an indispensable party if the decree granting the relief sought will require him to take action, either by exercising directly a power lodged in him or by having a subordinate exercise it for him." See also Johnson v. Kirkland, 290

F.2d 440 (5th Cir.), cert. denied, 368 U.S. 889, 82 S.Ct. 142, 7 L.Ed.2d 88 (1961). The high court had earlier held that local officers may be mere agents and subordinates of the superior officer, and that where the superior's "are the hands which would be tied" he should be made a party defendant. Gnerich v. Rutter, 265 U.S. 388, 44 S.Ct. 532, 68 L.Ed. 1068 (1924). Cf. May v. Maurer, 185 F.2d 475 (10th Cir. 1950).

The case before us now involves no challenge to the regulations, but only to a determination of agencies purportedly acting within those regulations. The Craft Board and CISC determinations are final; provision has not been made for administrative review by any superior agency. Cost of Living Council Order No. 22, which delegates authority to the Administrator for the Office of Wage Stabilization to issue decisions and orders with respect to cases involving pay adjustments under the regulations of the Cost of Living Council, specifically exempts CISC decision-making authority from the reach of that provision, as heretofore noted.

If the Craft Board and/or CISC approve the AGC contract, no other agency or official in the government is permitted to act administratively on the matter. Section 4, Cost of Living Council Order No. 6. Any judicial action in the nature of an injunction or mandamus to compel approval would expend itself only on the Craft Board or the CISC, rendering superior officials or agencies unnecessary parties.