Joseph STERTZ and Louis De Nicola, on their behalf and as representatives of all purchasers of oil and petroleum products from the Defendants, Plaintiffs,

v.

GULF OIL CORPORATION, Defendant,

and

James Schlesinger, Secretary of the Department of Energy, As Stakeholder.

Jeffrey A. WEINER, on his own behalf and as a representative of all others similarly situated, Plaintiff,

v.

GULF OIL CORPORATION, Defendant,

and

James Schlesinger, Secretary of the Department of Energy, As Stakeholder.

No. 78 Civ. 1813.

United States District Court,
E. D. New York.

March 6, 1980.

Null & Null, P. C., Garden City, N. Y. by Douglas P. Null, Garden City, N. Y., Arnold Levin, Philadelphia, Pa. [Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa.], for Jeffrey A. Weiner.

Lord, Day & Lord, New York City, for Gulf Oil Corp.; John W. Castles, 3d, Michael J. Murphy, Banks Brown, New York City, Joe A. Rudberg, Thompson & Knight, Dallas, Tex., of counsel.

E. R. Korman, U. S. Atty.–E. D. N. Y., Brooklyn, N. Y. by Elaine C. Buck, Asst. U. S. Atty., Brooklyn, N. Y., for Dept. of Energy; Larry Ellsworth, Ted P. Gerarden, Paul M. Geier, Attys., Washington, D. C., of counsel.

## MEMORANDUM AND ORDER

PLATT, District Judge.

With the advent of the economic dislocations of the early 1970's, Congress enacted the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 (note) ("the Act"). One of the stated purposes of that Act was to attempt to control the inflation that then afflicted, and more recently has devastated, our economy.[1]  Particular attention was given to the oil industry, as evidenced by Congress' passage of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 *et seq.*, which incorporates the 1970 legislation. Pursuant to those laws, Mandatory Petroleum Price Regulations were promulgated to set limits on prices legally chargeable for petroleum products. 10 C.F.R. Part 212.

The Regulations promulgated to establish and enforce appropriate price levels are exceedingly intricate and complex. While the Regulations provide for administrative remedies, Section 210 of the Act provides for legal remedies; unfortunately, the lines delineating the demarcation between administrative resolutions and legal relief are not always clearly drawn. The Code of Federal Regulations, 10 C.F.R. § 212.84, provides for disallowance of costs and includes provisions for the agency to require a "roll back" of prices and refunds to identifiable purchasers in the amount paid in excess of the amount permitted. At the same time, 12 U.S.C. § 1904 (note) provides for private suits by "any person suffering legal wrong" and allows the court to award plaintiffs "an amount not more than three times the amount of the overcharge upon which the action is based" plus reasonable attorneys' fees. (See especially Section 210 of the Act.)

This action presents a situation in which the dual nature of the remedies provided fosters confusion—and legal conflict. Plaintiffs, alleged purchasers of Gulf Oil Corporation ("Gulf") petroleum products, are seeking recovery, under § 210 of the Act, of overcharges purportedly made by Gulf in sales of those products. Gulf claims that it entered into a Consent Order with the Department of Energy ("DOE") dated

---

1. Most, if not all, reputable economists agree that increasing oil, gold and other natural resource prices merely reflect the value of the currency and do not cause inflation. The latter is caused, for the most part, according to the experts, by the government's devaluing or "printing" of currency or increasing the money supply. See Alchian and Allen, *Exchange and Production: Competition, Coordination, and Control*, 2d Ed., Ch. 19, pp. 486 et seq. This is a basic lesson which unfortunately our executive and legislative leaders apparently have yet to learn or have deliberately ignored. At this writing, inflation in the United States is said to have reached the "crisis stage." The Wall Street Journal, February 26, 1980, pp. 1, 3, quoting a statement by the President.

July 26, 1978 in which Gulf agreed to pay all persons, including judgment creditors under § 210, their proportional share of the $42,240,000 ("$42.24 million" or "Consent Order Fund"), which sum Gulf agreed to pay to DOE. The DOE argues, however, that the $42.24 million was intended only as settlement of the administrative refund mandated by 10 C.F.R. Part 212 and in no way was intended to affect private legal remedies brought under § 210 of the Act.

## DISCUSSION

The action now lies in the following procedural posture.

At a hearing held on November 2, 1979, it was agreed that while there were five motions in the first of the above cases * presently pending before this Court, only three of them needed immediate consideration and the remaining two (for class certification and discovery) might await resolution of the first three.

The first of the three motions was made by James Schlesinger, Secretary of the DOE ("Secretary"), and sought (i) an order pursuant to Rule 12(b) of the Federal Rules of Civil Procedure ("FRCP") dismissing the action without prejudice or, alternatively, dismissing the Secretary from the action and striking all material relating to the Consent Order between the DOE and Gulf, or, in the further alternative, staying the first of the above-captioned actions pending completion of the distribution of the Consent Order Fund on the ground that the DOE has primary jurisdiction over the Consent Order Fund and (ii) an order pursuant to FRCP Rule 26(c) staying all discovery pending disposition of this motion. (Pursuant to an informal agreement between the parties, the last portion of such motion has been rendered in part academic in that partial discovery has been proceeding in these actions).

The second of the three motions was brought on by an Order to Show Cause submitted by Gulf, seeking a preliminary injunction restraining the Secretary from taking any steps to effect or implement the Consent Order and granting the defendant Gulf leave to amend its answer to allege cross claims against the Secretary. The Order to Show Cause also contained a temporary restraining order enjoining the Secretary from taking any steps to effect or implement the Consent Order. The temporary restraining order was granted on consent and is still in full force and effect.

The third motion was made by the Secretary and seeks an order, pursuant to FRCP Rule 12(c), granting judgment on the pleadings and dismissing the action as to the Secretary on the grounds that as to him, the action fails to state a claim upon which relief can be granted and that the Court lacks subject matter jurisdiction.

## I

The first of the above-captioned actions was commenced with the filing of a Summons and Complaint by the plaintiffs on August 18, 1978. Thereafter, on September 25, 1978, plaintiffs filed an amended complaint. In essence, plaintiffs sue under § 210 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 (note) (expired April 30, 1974), as incorporated by the Emergency Petroleum Act of 1973, 15 U.S.C. § 751 *et seq.* (1976), on behalf of themselves and "all other purchasers of petroleum and petroleum products from Gulf from 1973 to 1976" (Amended Complaint pp. 2–3) and seek treble damages from Gulf in the amount of $221,700,000.00 plus attorneys' fees for alleged violations of the Emergency Petroleum Allocation Act. Plaintiffs also sue the Secretary as a Stakeholder of the Consent Order Fund. Prior to the commencement of this action Gulf, in an attempt to settle its differences with the DOE in the administrative action, agreed to pay the Fund to the DOE for distribution to injured purchasers of Gulf petroleum products. Plaintiffs seek to require the Secretary to pay this Consent Order Fund of $42,240,000.00 into the Registry of this Court (Amended

---

* The Weiner action was consolidated with the Stertz action pursuant to an order of Judge Broderick from the Eastern District of Pennsylvania.

Complaint p. 7), in an effort to protect their legal remedies. Issue was joined with the service and filing of Gulf's answer on or about October 31, 1978 and the Secretary's answer on or about November 14, 1978.

On or about November 27, 1978, plaintiffs served and thereafter filed a motion for class certification in the first of the above-captioned actions, pursuant to FRCP Rules 23(a) and 23(b)(3), asserting that plaintiffs' class included "all of those individuals and entities (both business and governmental) who purchased petroleum and petroleum products from Gulf between 1973 and 1976.-" Appearing in court, counsel for Gulf gave their conditional consent to plaintiffs' motion for class certification without prejudice to its rights to change its position and move to dissolve the class following discovery proceedings.

According to the Secretary, the Office of Special Counsel ("OSC") of the DOE's Economic Regulatory Administration, after its creation in December 1977, assumed from the Federal Energy Administration ("FEA"), a predecessor agency of the DOE, an investigation and audit of Gulf's interaffiliate "transfer of prices for crude oil which Gulf obtained abroad through its affiliates and imported into the United States." As a result of a prior investigation into Gulf's transfer pricing of foreign crude oil, the FEA had issued a Notice of Probable Violation dated May 8, 1974 and Notices of Proposed Disallowance dated July 14, 1975, August 29, 1975 and April 27, 1977. The latter Notice proposed a disallowance of $79,622,955.36 from Gulf's landed cost of foreign crude oil imported into the United States in transactions between Gulf's affiliated entities during the period October 1973 through May 1975.

For various reasons the OSC and Gulf determined it best to settle these alleged "probable violations" and they did so by entering into the Consent Order herein under 10 C.F.R. § 205.199J (see 43 Fed.Reg. 34186 (August 3, 1978)).[2]

Under the terms of the Consent Order the OSC undertook to implement procedures to refund the $42,240,000.00 to all those "who may have been overcharged by Gulf" as the result of the alleged overstated costs. As is evident from the "Supplemental Comments of the Special Counsel for Compliance and Gulf Oil Corporation on proposed Decision and Order" dated and executed June 7, 1979, the OSC and Gulf have stipulated that the

"Consent Order was not intended to expose Gulf to double liability, i. e., to have any part of the $42.24 million paid to any persons or entities (including the United States) other than purchasers of Gulf products who may have been overcharged so long as any overcharge claims whether asserted by legal action or by administrative claim, of such persons against Gulf remain outstanding and unsatisfied."[3]

Pursuant to a petition of the OSC, Mr. Melvyn Goldstein, Director of the Office of Hearings and Appeals ("OHA"), on August 28, 1978, issued an Interim Decision and Order[4] announcing a proposed administrative procedure to refund the $42.24 million in an attempt to implement the Consent Order.

Gulf's claim is that this Interim Decision and Order of the OHA has the effect of "ensuring Gulf's exposure" to the very double liability which the Consent Order sought to avoid in that, *inter alia*, it "(a) provided no method for satisfying out of the $42.24 million judgment creditors who obtained judgments under Section 210, and (b) provided for payment from the fund to indirect purchasers of Gulf's products who did not have standing to sue Gulf under Section 210, thus depleting the amount of the fund available to satisfy judgment claimants." (Gulf's Supplemental Memorandum pp. 5–6).

According to Gulf, the first of the motions made by the DOE in December of 1978 to dismiss the first of the above-captioned actions on the grounds of primary

2. Consent Order—See attached.

3. Supplemental Comments—See attached.

4. Interim Decision and Order—See attached.

jurisdiction would, if granted, leave intact the Interim Decision and Order and would preclude the application of any part of the Consent Order Fund to the satisfaction of any judgment that might be obtained in this or any other § 210 suit and would expose Gulf to the unintended double liability. (*Id.* p. 6). Therefore Gulf made the second of the above-referenced motions before this Court to enjoin the DOE from implementing the Consent Order in a manner which would expose Gulf to this double liability and to grant Gulf leave to amend its answer to allege cross-claims against the DOE.

The Government's positions and actions with respect to the intent of the Consent Order have not been consistent. The OSC first took the position (in opposition to Gulf's motion) that the question of any double liability was not raised by Gulf. (Affirmation of Paul Blum sworn to March 20, 1979).[5] Thereafter, when Gulf pointed out that the OSC and Mr. Blum had previously acknowledged in connection with other matters that the Emergency Petroleum Allocation Act (15 U.S.C. § 751 *et seq.*) never contemplated the imposition of double liability upon an alleged violator such as Gulf, the OSC had to retract its erroneous position and execute the Supplemental Comments referred to above. In particular, Mr. Blum on November 23, 1977, some nine months before the Consent Order, had made a written submission to the DOE's OHA in which he had stated

"It might be argued that if DOE has already disgorged a violator of his unlawful overcharges through refunds to the Treasury, the violator sued in a private action may be required to pay twice for the same violation. *Such a result was obviously not contemplated by the EPAA* ..." Emphasis added.

Subsequent to the Consent Order of July 26, 1978, the DOE on February 9, 1979, in discussing the comments of persons who had questioned the authority of the DOE, in general, and the OHA, in particular, to promulgate the Regulations providing for the distribution of refunds, specifically stated that:

"It should first be noted that the regulations do not require all or any portion of the refunds to be paid to the Treasury. That particular remedy is only one of the methods permitted under the regulations, and moreover, *the double liability problem to which the commenters (sic) refer could be avoided in cases in which payments may ultimately be made to the Treasury simply by delaying payment of all refunds until the period in which court actions can be initiated based on the pertinent violation has ended.* At that time the outcome of all pending court actions would be known and special arrangements could be made to reimburse the defendant firm for court judgments." (Emphasis added). 44 Fed.Reg. # 29 at 8564.

Notwithstanding these subsequent acknowledgments of error by the OHA, and in particular its acknowledgment in the Supplemental Comments as to the intent of the Consent Order, and notwithstanding the fact that this Court had enjoined the Secretary on March 5, 1979 from "taking any steps to effectuate or implement the above-referred to Consent Order", the OHA of the DOE (in an apparent deliberate defiance of this Court's Order) issued under date of July 13, 1979, published and has left standing new special refund procedures designed to implement the Consent Order (44 Fed. Reg. 43094 *et seq.*). These procedures failed to implement the stipulated intent of the parties to the Consent Order, to wit, that the same "was not intended to expose Gulf to double liability."

Specifically, as indicated above, Gulf claims that this Final Decision and Order provides that in addition to § 210 judgment creditors and direct purchasers of Gulf products, indirect purchasers who do not have standing to proceed against Gulf in a

---

5. "At no time prior to executing the Consent Order did Gulf indicate concern over the terms or conditions of any such claims procedure, or over treatment of persons suing Gulf, including judgment creditors, in such a program." Blum affidavit at 5.

judicial action will have a claim on the $42.24 million (*id.* p. 43097). The result, according to Gulf, will be to expose Gulf to the risk of being unable to satisfy § 210 judgment claims out of Consent Order Fund—a result contrary to the stipulated intent of the parties to the Consent Order. Further, Gulf claims that this Final Decision and Order violates the agreement between the parties that the OSC would have the right to approve any judicial settlements to be paid from the Consent Order Fund, "such approval not to be unreasonably withheld," by eliminating the reasonableness requirement. It further violates the stipulated agreement that in the event of a disagreement between Gulf and OSC as to the size of a reserve to cover lawsuits, an independent third party was to make that determination. The Final Decision and Order provides that the arbitrator is to be selected solely by the OHA.

Finally, and incredibly, the Government had the audacity at oral argument of these motions on November 2, 1979 to contend that the written agreement made and executed by the OSC on June 7, 1979 (see Supplemental Comments), did not mean what it said and that when it stated that "the Office of Special Counsel and Gulf agree that the July 26, 1978, Consent Order was not intended to expose Gulf to double liability" it meant that it only "agreed to recommend."

Of significance also in the background of these proceedings is the history of the second (Weiner) of the above-captioned actions which was commenced with the filing of a similar summons and complaint in the United States District Court for the Eastern District of Pennsylvania on May 17, 1979. On August 10, 1979, defendant Gulf moved to transfer that action to this Court and the Secretary filed a motion to dismiss on grounds similar to the ones he has advanced here. The District Court in the Eastern District of Pennsylvania granted Gulf's motion over the Secretary's objec-

tions in an Order dated August 17, 1979 and thereafter Gulf filed an answer in which it alleges four alternative cross claims against the Secretary. The first claim seeks an order that the Secretary comply with the Consent Order and agreements in the Supplemental Comments, and the second, third and fourth claims seek to annul the Consent Order on the ground of mistake, breach by the Secretary, and lack of authority on the part of the DOE to implement the same.

II

The question presented here is whether the DOE should be permitted to implement a Final Decision and Order dated July 13, 1979 formulating procedures to effect refunds of the $42.4 million settlement amount to (a) Section 210 judgment creditors and direct purchasers of Gulf products and (b) indirect purchasers of heating oil and gasoline (who do not have standing to proceed against Gulf in a judicial action).

The DOE argues that (i) plaintiffs' complaint against it must be dismissed under *Dyke v. Gulf Oil Corp. and DOE, et al.*, 601 F.2d 557 (T.E.C.A.1979); (ii) Gulf's motion for leave to amend its answer in the first of the above consolidated actions (the Stertz case) must be denied under the *Dyke* decision; and (iii) Gulf's motions must be denied because they lack merit in that (a) Gulf cannot challenge the Consent Order and (b) Gulf's argument that the Consent Order is unenforceable is spurious.

*Dyke* did not hold, however, as the DOE suggests, that the DOE must be dismissed from these cases. In both the *Stertz* and the *Weiner* actions plaintiffs state claims against the DOE asserting that the DOE has no claim against the $42.24 million fund involved herein, and *holds*[6] the same "which is properly the property of the plaintiffs." Plaintiffs further request that the DOE be required to pay the same over to the Registry of this Court to be awarded or credited to them.

6. While the DOE properly says it does not "hold" the funds because Gulf has to date refused to deliver them to it, nonetheless the DOE claims it is entitled to possession thereof

and this asserted interest is sufficient for purposes of ascertaining whether plaintiffs have a claim against it.

The DOE moved to dismiss these claims as to it and while such motion was pending, Gulf served and filed an answer in the Weiner case in which it asserts cross claims alleging (i) breaches of the Consent Order of July 26, 1978 and the agreement between it and the DOE dated June 7, 1979 by the issuance of a Final Decision and Order dated July 13, 1979, and (ii) that the Consent Order is null and void and of no legal effect by reason of mistake, by reason of DOE's breach thereof, and by reason of DOE's lack of authority to implement the same.

At oral argument, plaintiffs concurred in these positions insofar as they seek to nullify the DOE's attempt by its Final Decision and Order to remove the $42.24 million dollars from the money available to the class plaintiffs on whose behalf they seek to bring their actions.

As indicated, DOE's reliance on *Dyke* is misplaced. That decision merely held that joinder of the DOE in this type of case was not, as *Longview Refining Co. v. Shore*, 554 F.2d 1006 (TECA), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977), had seemed to suggest, mandatory or in all cases necessary.[7] *Dyke* did approve the holding in *Associated General Contractors of America, Inc. v. Laborers International Local 612*, 476 F.2d 1388 (Em. App.1973), that "no order of an . . . agency should be mandated or subjected to invalidation in any judicial proceedings unless that agency has been made party to such proceedings." (476 F.2d at 1407). The *Dyke* opinion disapproved of joinder of the DOE where joinder would "bring to a complete halt . . . the administrative auditing, investigation and remedial action which the agency could carry on independently under controlling statutes." 601 F.2d at 566. But as Gulf points out in its papers, most of the administrative proceedings are complete and the validity of the DOE's Final Deci-

sion and Order dated July 23, 1979 is under direct attack by interested parties.

Secondly, and of even greater significance, is the DOE's present intransigence on the question of subjecting Gulf to possible double liability. Recognizing the inequity of this position, the DOE Office of Special Counsel in writing "agree(d) that the July 26th Consent Order was not intended to expose Gulf to double liability." Notwithstanding this stipulation by its counsel, the DOE now takes the position that its OHA does not and need "not accept that" (Oral Argument TR 115).

In this Court's view, this is the second type of exception that the *Dyke* case contemplated[8] and the precise situation contemplated by FRCP Rule 19(a)(2)(ii) which requires joinder of the DOE as a party. So long as the DOE continues to take the position that the parties to the Consent Order did not mean what they agree that they said, "the [double, multiple, or otherwise] inconsistent obligation[s] contemplated by the rule" (FRCP Rule 19(a)(2)(ii)) are a reality and represent judgments that cannot be "adjusted and reconciled" (Slip Op. at 20). DOE's motions to dismiss and for judgment on the pleadings are therefore denied.

### III

There remains the question of Gulf's motion for a preliminary injunction restraining the DOE from publishing the Consent Order of July 1978 so as to make the same effective before a determination is made here with respect to "the true intent, meaning and validity of that order."

At the oral argument and in a subsequent letter dated November 15, 1979 addressed to the Court, DOE took the position that it would not be willing to postpone distribution to administrative claimants of the $42.24 million to be paid to the United

---

7. "We cannot agree . . . that the legislative history of the [Economic Stabilization Act] supports the idea that in a private action under section 210 the administrative agency *must* or should be joined as an involuntary defendant." (Emphasis added). 601 F.2d at 564.

8. " . . . over the objection of the agency it ordinarily may not be joined as a full-fledged party in section 210 actions, except . . . *under other compelling circumstances* . . . ." (Emphasis added). 601 F.2d at 569.

States by Gulf pursuant to the Consent Order until the resolution of these actions in order to insure an equitable distribution of such moneys to all persons entitled thereto.

█ In view of the legitimate concern of Gulf that failure to so postpone distribution may result in double liability, particularly given the DOE's unwillingness to honor its previous written stipulation on this point and its actions taken in violation of this Court's order, this Court feels it has no alternative but to issue the requested preliminary injunction. Gulf's adversaries have evidenced some concern about allowing Gulf to withdraw from that part of the Consent Order which requires it to post at least $42.24 million for distribution to injured purchasers. The Court agrees that this should not be permitted if the DOE is to be enjoined until an equitable method of distribution can be agreed upon or ordered by this Court. Therefore, as a condition of the injunction this Court will require that Gulf post as security (i) a bond or undertaking in the amount of $42.24 million with this Court or (ii) the $42.24 million with a mutually agreed upon (or, failing agreement, Court designated) escrow bank or agent in an interest bearing account or with the Clerk of this Court.

## CONCLUSION

Accordingly, the DOE's motions for dismissal and judgment on the pleadings are denied and Gulf's motion for a preliminary injunction and for leave to amend its answer is granted on the condition stated above.

## APPENDIX

### DEPARTMENT OF ENERGY

### OFFICE OF SPECIAL COUNSEL

CONSENT ORDER )
WITH )  Case No. N00R00007
GULF OIL CORPORATION)

## INTRODUCTION

Pursuant to the authority promulgated in 10 C.F.R. § 205.199J, and § 301 of the Department of Energy Organization Act, 42 U.S.C. § 7151, the Office of Special Counsel (OSC) of the Department of Energy (DOE) hereby enters into this Consent Order with Gulf Oil Corporation (Gulf). This Consent Order constitutes an agreement as to the disposition of the Notice of Proposed Disallowance issued to Gulf on April 27, 1977, and additional imported crude oil transactions found subject to disallowance. It specifically does not constitute an agreement as to any other matter subject to DOE regulations. Except as noted, this Consent Order is concerned exclusively with the crude oil component of Gulf's landed costs for the period October 1973 through May 1975 which is subject to disallowance pursuant to 6 C.F.R. § 150.356 and 10 C.F.R. § 212.83 and § 212.84.

## JURISDICTION

The Office of Special Counsel was created by a delegation of authority from the Administrator of the Economic Regulatory Administration which was created by § 206 of the Department of Energy Organization Act, 42 U.S.C. § 7136. Consequently, OSC, as part of DOE, is empowered to conduct and conclude audits and proceedings concerning the DOE Mandatory Petroleum Price and Allocation Regulations.

## FACTS

The stipulated facts upon which this Consent Order is based are contained in the following paragraphs numbered 1 through 5.

1. Gulf is a refiner subject to the refiner price rule and the transfer pricing rules of 6 C.F.R. § 150.356, 10 C.F.R. § 212.83 and § 212.84. In September 1973, the Cost of Living Council promulgated 6 C.F.R. § 150.-356, 38 F.R. 25686 (September 14, 1973), which provided:

Whenever a firm uses a landed cost which is computed by use of its customary accounting procedures, the Council may allocate such costs between the affiliated entities if it determines that such allocation is necessary to reflect the actual

costs of those entities or the Council may disallow any cost which it determines to be in excess of the proper measurement of costs.

This provision has continued in force to the present in the following sections: 10 C.F.R. § 212.83(e), 39 F.R. 1924 (January 15, 1974); 10 C.F.R. § 212.83(f), 39 F.R. 42368 (December 5, 1974); 10 C.F.R. § 212.83(b), 41 F.R. 15330 (April 12, 1976).

2. To establish standards for applying this section and to adopt more definitive regulations in this area, the Federal Energy Administration (FEA) issued two proposed rule-makings culminating in the promulgation of 10 C.F.R. § 212.84, 39 F.R. 38364 (October 31, 1974). *See* 39 F.R. 17771 (May 20, 1974); 39 F.R. 32310 (September 5, 1974).

3. Pursuant to § 212.84, Gulf reported its interaffiliate transfer prices to the FEA on Form FEA F701–M–O (Form 701). On the basis of the data collected from companies reporting third party transactions of foreign crude oil on Form 701, FEA has calculated maximum and representative prices for the months of October 1973 through May 1975 pursuant to the standards announced in § 212.84. Those prices were published in 42 F.R. 22190 (May 2, 1977).

4. Based on its determination of the maximum and representative prices, and an examination of the transfer prices reported to the FEA by Gulf, FEA issued a Notice of Proposed Disallowance (Notice) to Gulf on April 27, 1977. The Notice proposed the disallowance of $79,622,995.36 from Gulf's landed costs of crude oil imported in transactions between affiliated entities during the period October 1973 through May 1975. This revised Notice superseded the three original Notices, one issued to Gulf on July 14, 1975 and the remaining two on August 28, 1975. Gulf also received, under date of May 8, 1974, a Notice of Probable Violation (NOPV) alleging that Gulf's landed cost for certain crude oils imported in transactions between affiliated entities during the period October 1973 through January 1974 were overstated.

5. Gulf filed timely replies to each Notice and the NOPV issued to it, as well as a five-volume supplemental reply to the three original Notices. Gulf filed a formal response to the April 1977 Notice on June 9, 1977 and met with DOE officials on October 13, 1977. Gulf submitted additional information in subsequent conferences with OSC in connection with the issues raised in the Notice, asserting that it should be modified or rescinded. Gulf has contested the maximum and representative prices established for its crude oil from Ecuador, Columbia and Angola, which are determined in comparison to other crude oils in the same geographic region. Gulf has also contested the valuation of various Venezuelan crude oils and the market prices of Nigerian crude oil. The appropriate landed costs for Indonesian Katapa crude oil purchased through affiliates during the period August 1973 through January 1976 has also been considered.

6. OSC has informed Gulf that adjustments have been made to the disallowance, pursuant to modifications to the maximum and representative prices. The modifications to Venezuelan and Ecuadorian crude oil prices are the result of the correction of underlying data previously misreported to DOE. Further modifications to Ecuadorian prices were the result of the establishment of valid market prices in a number of months. The adjustments resulted in a total reduction of the disallowance of $5,709,511.51.

7. Gulf without admitting any noncompliance with, or violation of, any rule or regulation of the DOE, desires to resolve, pursuant to 10 C.F.R. § 205.199J, the dispute arising between itself and the OSC as a result of the matters described herein with minimal disruption to its business operations and without more formal compliance action by OSC. OSC, by means of this Consent Order, desires to conclude the pending compliance proceeding. Gulf and DOE recognize that the time periods involved and the determination of proper costs allowable make it most difficult to determine whether any person sustained an overcharge in the purchase of covered prod-

ucts from Gulf; and, therefore, Gulf and OSC have mutually determined to conclude these matters and agree to the terms and conditions specified herein.

### TERMS AND CONDITIONS

8. Gulf agrees that within 15 days of notice that the Consent Order has been made final, it will tender to the United States, upon demand, a certified check in the amount of $42,240,000.00. The payment of this amount shall be in lieu of any other remedial action including a redetermination of increased costs of crude oil and resulting overrecoveries of costs, attributable to disallowed landed costs. Gulf and OSC agree that such payment to the United States represents the most effective method of achieving payment to those who may have been overcharged by Gulf.

9. Gulf further agrees to assist in the evaluation of any claims filed by persons asserting a right to any portion of the payment. Such evaluation will be made prior to disposition of the funds to the Treasury of the United States. DOE agrees that it will accept and discharge the full administrative DOE responsibility for establishing and administering a program for evaluating such claims and making restitution to such persons having validated claims.

10. OSC finds, due to the time and expense which could be involved in the litigation of the issues raised by Gulf, that it is in the best interest of the United States to deem Gulf to have complied with 6 C.F.R. § 150.356 and 10 C.F.R. § 212.83 and § 212.84 upon Gulf's fulfilling the requirements of this Consent Order.

11. In consideration of Gulf's agreement to the terms and conditions of this Consent Order, OSC agrees that Gulf's performance under this Consent Order will constitute compliance with 6 C.F.R. § 150.356, 10 C.F.R. § 212.83 and § 212.84 with respect to the determination of Gulf's imported crude oil costs in the period October 1973 through May 1975, including the landed costs of Indonesian Katapa crude oil purchased by Gulf through a foreign affiliate from August 1973 through January 1976. OSC also agrees that it would not further the public interest to take any additional action against Gulf with respect to the allegations in the previously mentioned Notice or the NOPV; provided, however, that OSC reserves the right to take further remedial action in this case if OSC determines that information upon which this Order is based was materially erroneous or that the actions of Gulf have not been undertaken in a manner consistent with the aforementioned terms and conditions of this Order or with applicable DOE rules and regulations. OSC hereby expressly further reserves the right to take such actions as may be appropriate under DOE regulations concerning other costs measured, reported or recovered by Gulf and which are not the subject of this Consent Order.

15. The provisions of 10 C.F.R. § 205.199J are applicable to this Consent Order and are incorporated by reference herein.

> I, the undersigned, a duly authorized representative of Gulf Oil Corporation hereby agree to and accept on behalf of said corporation the foregoing Consent Order.
>
> Signed: _____
> Name: Jerry McAfee
> Title: Chairman of the Board
> Dated: July 26, 1978
>
> I, the undersigned, a duly authorized representative of the Office of Special Counsel hereby agree to and accept on behalf of the Department of Energy the foregoing Consent Order.
>
> Signed: _____
> Name: Paul L. Bloom
> Title: Special Counsel, OSC, DOE
> Dated: 7/26/78

UNITED STATES OF AMERICA DEPARTMENT OF ENERGY OFFICE OF HEARINGS AND APPEALS

SUPPLEMENTAL COMMENTS OF THE SPECIAL COUNSEL FOR COMPLIANCE AND GULF OIL CORPORATION ON PROPOSED DECISION AND ORDER

The Special Counsel for Compliance (Special Counsel) of the Department of Energy

(DOE) and Gulf Oil Corporation (Gulf) hereby jointly submit the following comments as a supplement to the comments submitted by the Special Counsel on April 20, 1979, and by Gulf on April 19, 1979, in the matter of the Proposed Decision and Order implementing special refund procedures in case No. DFF–0001. Following the submission of comments by Gulf and the Special Counsel on the Proposed Decision and Order, the Special Counsel and Gulf determined that it was necessary for them to have further discussions regarding the comments submitted by each of them. As a result of these further discussions, Gulf and the Special Counsel have reached agreement on matters which were not included in our respective comments, but which, in our opinion, should be included in the final Decision and Order adopted by the Office of Hearings and Appeals.

The Office of Special Counsel and Gulf agree that the July 26, 1978, Consent Order was not intended to expose Gulf to double liability, i. e., to have any part of the $42.24 million paid to any persons or entities (including the United States) other than purchasers of Gulf's products who may have been overcharged so long as any overcharge claims, whether asserted by legal action or by administrative claim, of such persons against Gulf remained outstanding and unsatisfied. Gulf has concurred with Special Counsel that a final Decision and Order incorporating these recommendations will minimize to an acceptable level Gulf's "double liability" concerns under the Proposed Decision and Order.

As more specifically stated below, Special Counsel and Gulf have agreed that direct purchasers of Gulf products who institute actions against Gulf pursuant to Section 210 of the Economic Stabilization Act of 1970 for overcharges based upon alleged regulatory violations resolved by the Consent Order, and who obtain judgments and settlements regarding such claims on or before fifteen (15) months from the date of publication of the final Decision and Order, should be compensated from the Consent Order fund of $42.24 million on an equal footing with direct purchasers making administrative claims, provided, however, that the amount of any such judgment to be satisfied from the Consent Order fund should be limited to such portion of the judgment which is the proportion of $42.24 million to the total overstatement of landed costs upon which the judgment is determined, if such disallowed landed costs exceeds $42.24 million.

Both Gulf and the Special Counsel agree that a reserve fund out of the Consent Order fund should be established for litigation pending and unresolved at the end of such fifteen (15) months from the date of publication of the final Decision and Order. Gulf and the Special Counsel also agree that any necessary expenses, as determined by the OHA, incurred in connection with the implementation of the final Decision and Order should be paid from the Consent Order fund.

In addition to these general considerations, Gulf and the Special Counsel have agreed that the following specific responses of the Special Counsel to Gulf's comments of April 19, 1979, as herein modified, represent the concepts of an administrative refund procedure which should be adopted for the distribution of the Consent Order fund.

*Modified Response to Annex B to Gulf's Comments*

A. (1) Persons who have obtained final judgments against Gulf after trial or by settlement with the approval of the Special Counsel, such approval not to be unreasonably withheld, in legal actions brought by direct purchasers pursuant to Section 210 of the Economic Stabilization Act which are based upon claims arising out of an alleged overstatement of landed crude oil costs during the period August 19, 1973, through January 1976 should be included within the class of persons who have validated claims under the final Decision and Order.

(2) Persons who within fifteen (15) months of the publication of the final Deci-

sion and Order have obtained settlements of claims against Gulf, other than settlements resulting in a final judgment as provided in A(1), which are asserted in legal actions brought by direct purchasers pursuant to Section 210 of the Economic Stabilization Act and which are based upon claims arising out of an alleged overstatement of landed crude oil costs during the period August 19, 1973, through January 1976 should be included within the class of persons who have validated claims under the final Decision and Order, but only to the extent that such settlement amounts are specifically approved by the Special Counsel, such approval not to be unreasonably withheld.

(3) If there are one or more pending claims against Gulf which are asserted in legal actions brought prior to the expiration of fifteen (15) months from the date of publication of the final Decision and Order by direct purchasers pursuant to Section 210 of the Economic Stabilization Act and which are based upon an alleged overstatement of landed crude oil costs during the period August 19, 1973, through January 1976, a reasonable reserve out of the $42.24 million should be created in order to provide for the payment of each such claim. Gulf and Special Counsel will use their best efforts to agree to the amount of reserve for each such claim as soon as practicable after the filing of the action. If the Special Counsel and Gulf are unable to agree upon the amount to be held in each such reserve within thirty (30) days following the expiration of the fifteen (15) month period, they shall immediately submit the determination to an independent third party with the expectation that such determination will be made within sixty (60) days following the submission to such third party. The Special Counsel and Gulf agree to assist the independent third party fully to expedite this determination.

B. The identification of those persons who are within the classes described in paragraphs A(1), A(2), and A(3) should be made within fifteen (15) months from the date of publication of the final Decision and Order.

C. No distribution of the Consent Order fund should be made prior to a determination as to (1) those amounts which are to be paid from that sum to persons described in paragraphs A(1) and A(2) above; (2) the amounts of the reserves agreed to by Gulf and the Special Counsel for persons described in paragraph A(3); and (3) the amounts which are to be paid to direct purchasers of covered petroleum products from Gulf who have filed administrative claims in the refund program. In order for persons described in paragraphs A(1) and A(2) to have their judgments or settlements considered for payment from the Consent Order fund, they, or Gulf on their behalf, should be required to file a claim with the DOE which is based upon such judgment or settlement. Persons described in paragraph A(3) who wish to have claims they have pending against Gulf in litigation under Section 210 of the ESA considered by the DOE, may also file claims under the administrative procedure. To the extent that such pending claims are validated and authorized for payment by the DOE, appropriate adjustments in the amounts to be held in reserve under paragraph A(3) should be made.

D. The amounts to be paid to persons described in paragraphs A(1) and A(2) should be made from the Consent Order fund on an equal footing with the amounts to be paid to direct purchasers of covered products from Gulf who only file administrative claims under the special refund procedures; provided, however, if a claim is filed by a person holding a judgment under paragraph A(1), or by Gulf on their behalf, which is based upon an overstatement by Gulf of landed costs for interaffiliate crude oil transactions in excess of $42.24 million, then the DOE may approve for payment only such portion of the judgment which is the proportion of $42.24 million to the total overstatement of landed costs upon which the judgment is determined.

E. The balance of the Consent Order fund remaining after a determination by

the DOE of the total amounts to be paid to direct purchasers who have filed administrative claims, and to the persons described in paragraphs A(1) and A(2), and the appropriate amounts to be held in reserve under paragraph A(3), should be available for payment to persons other than direct purchasers of Gulf covered products who have filed administrative claims under the special refund procedures. The disbursement of any amount remaining after a determination of the sum payable to persons other than direct purchasers should be at the direction of and as determined by the OHA. The determination of the amount available to persons other than direct purchasers or the disbursement of the balance remaining need not await a resolution of the pending claims for which the reserves under paragraph A(3) are created.

F. (1) Gulf may retain the Consent Order fund in a separate identifiable account on its records, subject to such terms and conditions as are required by the OHA after consultation with Gulf. Gulf should be required to make only such payments from this fund as are directed by the OHA pursuant to the terms of the final Decision and Order. Payment to any particular class or claimant provided for hereunder need not await payment to any other class.

(2) As each claim for which a reserve has been established under paragraph A(3) is settled with the approval of the Special Counsel or results in a final judgment, the OHA should direct an appropriate payment for such settlement or judgment out of the reserve fund, such payment not to exceed the amount set aside in the reserve fund for the claim. The amount approved for payment may be limited, if appropriate, in accordance with the formula outlined in the second clause of paragraph D. If the amount paid for the settlement or judgment is less than the amount set aside in the reserve fund for the claim, then the

remaining balance of such reserve should be available for payment to persons filing administrative claims and persons described in paragraphs A(1) or A(2) in accordance with the provisions herein. If the claims of such persons have been fully satisfied under the procedures adopted in the final Decision and Order, then the remaining balance should be disbursed in accordance with paragraph E, above.

G. If an action for judicial review of the Decision and Order is filed within 30 days of its publication in the Federal *Register* which challenges the authority of the DOE or the validity of the Decision and Order, then Gulf should not be obligated to pay any part of the Consent Order fund to claimants until fifteen (15) days following final adjudication or other resolution of such judicial action. To the extent that the action for judicial review challenges only a limited portion of the Decision and Order, then Gulf should be obligated to pay to persons with validated claims that portion of the Consent Order fund which is unaffected by the litigation. In the event that such an action for judicial review results in a determination that the authority of the DOE or the validity of the Decision and Order is materially deficient, in whole or in part, Gulf and Special Counsel have agreed they will negotiate in a good faith effort to promptly agree upon a remedy consistent with such determination with respect to the whole or any part of the Consent Order fund so affected by the determination.

Respectfully submitted,

(s) Paul L. Bloom

Paul L. Bloom
Special Counsel for Compliance,
Department of Energy

(s) Charles A. Boyce

Charles A. Boyce
Associate General Counsel,
Gulf Oil Corporation

Date: June 7, 1979.

MONDAY, AUGUST 28, 1978
PART V

# DEPARTMENT OF ENERGY

## Office of Hearings and Appeals

■

# GULF OIL CORPORATION— SETTLEMENT OF CLAIMS

Issuance of Interim Decision and Order, and Request for Comments Regarding Final Decision

[3128–01]

# DEPARTMENT OF ENERGY

## Office of Hearings and Appeals

### GULF OIL CORP. REFUNDS—SETTLEMENT OF CLAIMS

#### Issuance of Interim Decision and Order and Request for Comments Regarding Final Decision

AGENCY: Office of Hearings and Appeals, Department of Energy.

ACTION: Notice of interim decision and order and request for comments regarding decision.

SUMMARY: The Department of Energy (DOE) hereby gives notice of the issuance of an interim decision and order establishing procedures for making refunds to firms and individuals who purchased refined petroleum products from the Gulf Oil Corp. (Gulf) during the period August 1, 1973, through January 31, 1976. Gulf had agreed to remit $42,240,000 to the Department of Energy to settle certain claims for pricing violations described in a proposed consent order signed by Gulf and the DOE Office of Special Counsel on July 26, 1978 (43 FR 34185 (August 3, 1978). In the event the proposed consent order is issued in final form, this sum, less amounts attributable to products that Gulf itself consumed or that were exempt from pricing regulations, will be available for refunds to purchasers. Pending settlement of claims, the total sum available from Gulf will be placed in an escrow account. The escrow agent will administer the account in accordance with the directives of the Office of Hearings and Appeals.

The interim decision and order indicates that applications for refunds shall be submitted to the Office of Hearings and Appeals. In view of the nature of the proceeding and in order to establish efficient and effective procedures for adjudicating claims, the Office of Hearings and Appeals will utilize several presumptions. The first presumption is that the $42,240,000 to be remitted by Gulf was applied evenly on a volumetric basis to all refined petroleum products that Gulf produced during the period beginning August 1, 1973, and ending January 31, 1976, and was proportionately reflected during that period in the prices that Gulf charged for all such products. The second presumption is that resellers who purchased Gulf products during this period would have passed through to their own customers 60 percent of the benefits of any price reduction which would have occurred if Gulf had determined its prices in accordance with applicable DOE regulations.

It is further presumed that ultimate consumers who purchased Gulf products during the relevant period purchased them after two prior sales had occurred to wholesalers or retailers. Consumers may rebut this presumption by proving that they purchase products directly from Gulf or after only one prior sale.

Routine refund claims will be handled by an administrator who will be appointed and supervised by the Office of Hearings and Appeals. A limited review will be provided within the Office of Hearings and Appeals from adverse decisions of the administrator. All applications for refunds must contain adequate documentation of the volume of purchases of covered products from Gulf. Claims for amounts totaling less than $5 by individual consumers and less than $100 by business entities will be considered to be de minimis and will not be processed.

Public comment on the interim decision and order and on the procedures contained in the appendix is invited. The Office of Hearings and Appeals is particularly interested in comments regarding the form of notice that it should employ after it publishes the final decision and order, and the type of material that Gulf should be directed to make available to substantiate applications for refunds.

A public hearing will also be convened in Washington, D.C., on September 26, 1978, to consider the refund procedures. Persons who desire to make an oral presentation at the hearing concerning the interim decision and order must submit a request to speak which indicates the speaker and the amount of time requested. All persons submitting such requests will be notified by the DOE prior to the date that their prepared oral statements are to be submitted to the DOE.

Pending consideration of comments and hearing proceedings, a determination of the procedures to be followed in handling Gulf refund claims is being issued on an interim basis.

DATES: Written comments by September 18, 1978; requests to speak at public hearing by September 15, 1978; witnesses notified September 20, 1978; prepared statements by September 22, 1978; public hearing to be held at 9:30 a.m., September 26, 1978.

ADDRESS: Written comments (15 copies required), requests to speak and statements (100 copies required) should reference case No. DSG–0028 and shall be submitted to the following address: Office of Public Hearing Management, Box VH, 2000 M Street NW., Room 2313, Washington, D.C. 20461. The public hearing will be held at the same location in Room 2105.

FOR FURTHER INFORMATION CONTACT:

Debra Kidwell, DOE Office of Public Hearing Management, Box VH, 2000 M Street NW., Room 2313, Washington, D.C. 20461, 202-254-5201.

George B. Breznay, Deputy Director, Office of Hearings and Appeals, 2000 M Street NW., Room 8014, Washington, D.C. 20461, 202-254-9681.

SUPPLEMENTARY INFORMATION:

#### PUBLIC HEARING AND COMMENT PROCEDURE

Any interested person may participate in this proceeding by submitting data, views, or suggestions as to whether the refund procedures stated in the interim decision and order should be modified or whether alternative procedures should be adopted. Comments should be submitted by 4:30 p.m., e.d.t., September 18, 1978, to the Office of Public Hearing Management at the address indicated above and should be identified on the outside envelope and on the document with the designation: "Refund Procedures Case No. DGS–0028." Fifteen copies should be submitted.

Any information or data submitted which are considered to be confidential must be so identified and submitted in writing, one copy only. The DOE reserves the right to determine the confidential status of such information or data and to treat it according to our determination.

The DOE has scheduled a public hearing in order to receive oral comments on the effectiveness of the refund procedures and suggestions regarding the possible modification of those procedures. The hearing will be held on September 26, 1978, at 2000 M Street NW., Room 2105, Washington, D.C., at 9:30 a.m. Any person who wishes to make an oral presentation at the hearing should submit a request to speak, including the name and title of the speaker, and the amount of time requested, to the Office of Public Hearing Management by September 15, 1978, at the address provided at the beginning of this notice. The Office of Hearings and Appeals reserves the right to limit the number of persons to be heard and to establish the procedures governing the conduct of the hearing. Those individuals selected to make oral presentations will be notified by September 20, 1978. The Director of the Office of Hearings and Appeals or his designee will preside at the hearing.

If any person wishes to ask a question of any person who has made an oral presentation at the hearing, he or she may submit the question, in writing, to the presiding officer. The presiding officer will determine whether the question is relevant and whether the time limitations permit it to be presented for an answer. Any further

procedural rules needed for the proper conduct of the hearing will be announced by the presiding officer.

A transcript of the hearing will be made and may be purchased from the reported. The DOE will retain the entire record of the hearing and will make it available for inspection at the Office of Hearings and Appeals Public Docket Room, Room B-120, 2000 M Street NW., Washington, D.C. 20461, between the hours of 1 p.m. and 5 p.m., Monday through Friday.

Issued in Washington, D.C., August 22, 1978.

MELVIN GOLDSTEIN,
*Director,*
*Office of Hearings and Appeals.*

INTERIM DECISION AND ORDER OF THE
DEPARTMENT OF ENERGY

PETITION FOR SPECIAL REDRESS

Name of petitioner: Office of Special Counsel for Compliance, Department of Energy.
Date of filing: August 11, 1978.
Case No.: DSG-0028.
This proceeding involves the procedures which the Department of Energy intends to use in directing refunds to certain customers of the Gulf Oil Corp. The total amount of the potential refunds is $42,240,000.

On August 11, 1978, the Special Counsel for Compliance of the Department of Energy (OSC) filed a petition for special redress. In that petition the OSC requested that the Office of Hearings and Appeals adopt interim procedures for the disposition of a refund remitted to the United States by Gulf Oil Corp. (Gulf). This refund would be paid pursuant to a proposed consent order entered into by Gulf and the OSC on July 26, 1978, notice of which was published for comment: 43 FR 34185 (August 3, 1978); see 10 CFR 205.199J.

In the proposed consent order, the OSC and Gulf reached an agreement to settle a compliance proceeding which had been instituted against Gulf in April 1977 by a notice of probable disallowance (NOPD). The Federal Energy Administration alleged in the NOPD that Gulf had overstated its costs with respect to interaffiliate imported crude oil transactions by $79.6 million for the period October 1973 through May 1975. The DOE subsequently reduced the amount of disallowance by $5.7 million on the basis of subsequent corrections to information which had been reported to the DOE and adjustments to maximum and representative prices for crude oil which had been transferred by Gulf. The OSC and Gulf agreed in the proposed consent order to settle the disallowance claim and any overrecoveries for Indonesian Katapa crude oil purchased by Gulf through a foreign affiliate from August 1973 through January 1976. The proposed consent order also referred to overrecoveries alleged in a notice of probable violation issued to Gulf on May 8, 1974.

Under the terms of the proposed consent order, Gulf will tender $42,240,000 to the United States in lieu of any further remedial action with respect to these matters. However, the proposed consent order states that Gulf and DOE recognize that the time periods involved and the determination of proper costs allowable make it most difficult to determine whether any person sustained an overcharge in the purchase of covered products from Gulf.* * *

In view of the difficulties perceived in the determination of whether any person was overcharged as a result of the activities set forth in the proposed consent order, the DOE further agreed to accept responsibility for establishing an administrative procedure for evaluating claims for a portion of the refund and making restitution to persons presenting valid claims. In the present petition, the OSC requests the establishment of an ad hoc adjudicatory procedure within the Office of Hearings and Appeals for the consideration and disposition of any such claim.

I. AUTHORITY

The OSC states in its petition that the Secretary of Energy has the authority to issue the proposed consent order and to establish procedures for considering claims by persons for a portion of the payment specified in the order. We agree with that position. The authority of the FEA and the DOE to issue remedial orders requiring refunds to purchasers has been consistently sustained. *Shell Oil Company,* 3 FEA Par. 80,545 (January 6, 1976); *accord, Southwestern Exploration Consultants, Inc.,* 1 DOE Par. 80,257 (May 9, 1978); *MacKellar, Inc.,* 5 FEA Par. 80,655 (June 8, 1977). The basis for these holdings was expressed in *Shell Oil Company* in the following manner:

The Congress was well aware of the fact that the Cost of Living Council had issued remedial orders requiring price rollbacks and refunds under the authority of the ESA [Economic Stabilization Act of 1970, as amended], and that this practice had been recognized as a legitimate exercise of regulatory authority by the Federal courts. See e.g., *University of Southern California v. Cost of Living Council,* 472 F. 2d 1065 (T.E.C.A. 1972), cert. denied, 410 U.S. 928 (1973); and *De Rieux v. Five Smiths, Inc.,* 499 F. 2d 131 (T.E.C.A. 1974). As the successor to the Cost of Living Council with respect to the administration of price controls covering the petroleum industry, the FEO (and later the FEA) was also created to meet a national crisis and received the same broad discretionary powers for the enforcement of price controls. See Exec. Order No. 11748, 3 CFR 376 (1974); see also *Note, Phase V: The Cost of Living Council Reconsidered,* 62 Geo. L. J. 1663, 1665 (1974). In enacting the EPAA, the Congress authorized the FEA to promulgate a regulatory program in order to insure, to the maximum extent feasible, that equitable prices would be charged for refined petroleum products throughout the United States. EPAA, sections (4)(a) and 4(b)(1).
*Shell Oil Company,* 3 FEA at 80,690.

Moreover, section 7(a) of the Federal Energy Administration Act of 1974 (FEAA), 15 U.S.C. 766(c), expressly authorizes the FEA Administrator to "promulgate such rules, regulations and procedures as may be necessary to carry out the functions vested in him. * * *" Those functions include a directive to "promote stability in energy prices to the consumer * * * [and] prevent unreasonable profits within various segments of the energy industry. * * *" FEAA 5(b)(5), 15 U.S.C. 764(b)(5). The responsibilities involved also extend to promulgating regulations providing for the "equitable distribution of crude oil, residual fuel oil and refined petroleum products at equitable prices among all the regions and areas of the United States and sectors of the petroleum industry. * * *" Emergency Petroleum Allocation Act of 1973, section 4(b)(1)(F).

Pursuant to section 301 of the Department of Energy Organization Act, 42 U.S.C. 7151, all the functions formerly vested by law in the FEA Administrator have been transferred to the Secretary of Energy. The regulation authorizing the issuance of the proposed consent order, 10 CFR 205.1991, was promulgated pursuant to that authority. 43 FR 3995, 4001 (January 31, 1978). The proposed consent order was in turn issued pursuant to section 205.1991 and is designed to prevent the retention of revenues by a party who allegedly violated mandatory price regulations and to compensate the customers that have been overcharged. See *Shell Oil Company,* 3 FEA at 80,691.

Gulf is a major integrated petroleum firm engaged in the production, transportation, refining, and marketing of crude oil and refined petroleum products. Gulf sells an extensive schedule of petroleum products. Since it is one of the largest petroleum firms in the United States, the purchasers of its products number in the millions. Because of the nature of the particular pricing practices alleged in the NOPD, which concern a fundamental element in a refiner's calculation of maximum permissible prices, each purchaser of Gulf products was potentially affected. However, the flexibility accorded refiners under the refiner price rule of the mandatory petroleum regulations makes it extremely difficult to allocate specific overcharges to any particular sales transaction or to identify the specific customers who were overcharged. That determination is further complicated in this case by the fact that the practices in question occurred as long ago as 5 years.

Under these circumstances it would appear necessary to implement an administrative claims procedure in order to insure that the statutory objectives referred to above are fulfilled. It would, for example, be exceedingly difficult for the DOE to insure that prices for petroleum products are established in an equitable manner unless an efficient and effective remedy exists for directing refunds to parties that have been overcharged. It would appear essential to do so in this case on the basis of a special claim procedure because of the difficulties discussed above which a particular claimant would otherwise experience in establishing the amount of overcharges that should properly be attributable to a purchase that he made. In other words, even though it is very likely that overcharges occurred, the discretion which Gulf possessed as to the manner in which it could determine its prices makes it very unlikely that any particular claimant could prove the nature and extent fo its direct injuries. Unless a special claims procedure is adopted, there would appear to be little likelihood that individual purchasers and consumers would be able to obtain refunds. This situation would occur despite the fact that purchasers and consumers as a class are entitled to refunds. In view of these considerations we have concluded that the statutory provisions referred to above provide implicit authority for the DOE to implement an administrative claims procedure under the facts presented in this case.

Moreover, even aside from this authority which derives from the statutory objectives which the DOE has been directed to fulfill,

other recently enacted statutory provisions would appear to provide an even more direct expression of the Secretary's authority to establish and administer a claims procedure. Section 644 of the Department of Energy Organization Act (DEOA), 42 U.S.C. 7254, authorizes the Secretary to "prescribe such procedural and administrative rules and regulations as he may deem necessary or appropriate to administer and manage the functions now or hereafter vested in him." Those functions certainly encompass the statutory objectives discussed above of insuring that equitable prices are charged to consumers and to all sectors of the petroleum industry. The Secretary may in turn delegate the promulgation of procedures or rules for doing so to the Office of Hearings and Appeals. DEOA, section 642, 42 U.S.C. 7252.

We are therefore satisfied that sufficient authority exists to support the establishment of the type of procedure that the OSC has requested. We are also persuaded that such a procedure is necessary and appropriate in this case. The petition will therefore be granted and the specific procedures set forth in the appendix will be adopted by the Office of Hearings and Appeals for adjudicating individual claims for refunds in the Gulf proceeding.

## II. PROCEDURAL MATTERS

As a result of Gulf's recording of excessive costs to reflect certain of its crude oil purchases, every purchaser of a covered product refined by Gulf during the relevant period has potentially been affected. Consequently, there are special problems associated with the establishment of an ad hoc procedure for adjudicating claims.

The large number of potential claimants first presents the question of the proper form of notice which should be given of the procedures for requesting a refund. We believe that such notice should include publication in the FEDERAL REGISTER and the preparation of appropriate press releases. The procedures described in the appendix of this decision specifically provide for that type of notice. We are also considering providing further notice through advertisements in newspapers and periodicals of general circulation, announcements in trade and professional journals and direct notice to various trade associations and to selected Gulf customers. Funds could be appropriated for this purpose from the refund remitted by Gulf.

A more fundamental question presented by the large number of potential claimants in this case concerns the manner in which claims should be administered. It would not be feasible for the Office of Hearings and Appeals to deal individually with thousands of claims, many of which could be for relatively small amounts. On the other hand, we would not wish to adopt any procedure that effectively prevents small firms or ultimate consumers from presenting legitimate claims for refunds. Consequently, we intend to establish a procedure under which only a small number of claims would be considered directly by the Office of Hearings and Appeals. All other claims will be directed to an administrator who is appointed and supervised by the Office of Hearings and Appeals. The Administrator will reach a determination as to those claims under guidance and supervision provided by the Office of Hearings and Appeals. The procedures will also establish a limited right to appeal adverse decisions of the Administrator to the Office of Hearings and Appeals.

A de minimis rule will also be established. Under that rule, claims will be considered from individual consumers only if the claim amounts to $5 or more. Claims from business consumers or resellers will be considered only if the claim amounts to $100 or more.

## III. STANDARDS FOR EVALUATION

Any claim for a refund should logically consist of two elements. The applicant should first be able to show that he was in fact injured as a result of the practices cited in the proposed consent order, and secondly, he should be able to demonstrate with a reasonable degree of certainty the extent of the injury.

A. *Whether an Injury Was Sustained.* For purposes of this proceeding, a consumer will generally be able to satisfy the first criterion by showing only that he purchased covered Gulf products during the relevant period. However, because of the nature of their business activities, resellers and consumers in certain regulated industries will have to make a greater showing to establish that they were injured by the Gulf practices than the mere showing that they purchased covered Gulf products.

Insofar as resellers are concerned, this requirement stems from the fact that a reseller might well have had an obligation under the DOE regulatory program to pass through to its own customers the entire benefit of the price reductions which it would have received if Gulf had in fact followed the correct pricing procedures. For example, the maximum price which a reseller can charge for a covered product is based to a substantial extent on the cost which it incurs in buying that product from its supplier. If a reseller was already selling a product at the maximum permissible selling price and then received a price reduction from its supplier, the reseller would be obligated to pass that reduction on to its own customers on a dollar-for-dollar basis. Since a reseller in that position could not have retained the benefit of the price reductions, the reseller involved would not appear to have been injured by the price Gulf charged.

Consequently, in order to qualify for a refund, a reseller should be prepared to demonstrate that it was selling a Gulf product at a price that was below its maximum permissible selling price during the period of time covered by the proposed remedial order.

Similarly, in the case of firms whose selling prices were regulated by governmental agencies, refunds would be contingent upon showing that the applicant had not already passed through the cost increases to its customers. Public utilities, regulated airlines, railroads and possibly others would be included in this category. Firms regulated in that manner, however, might still be able to obtain a refund despite having passed through all cost increases, if they are able to give satisfactory assurances that any refunds received will be passed on to their customers in an equitable manner.

B. *Measurement of Injury.* The second element of the claims procedure involves a determination of the extent of the injury which a particular claimant experienced as a result of the Gulf transfer pricing practices. As the discussion below indicates, the nature of a crude oil cost disallowance makes it exceedingly difficult to establish with precision the exact amount by which a particular firm or person was overcharged. Consequently, it will be necessary to establish presumptions as to the amount of refunds which should be paid to a particular reseller or consumer.

The inherent difficulty in determining with precision the overcharges to a particular claimant is in substantial part a result of the nature of the proposed consent order. As stated above, the proposed consent order does not concern a pricing violation per se, but instead involves a proposed disallowance of crude oil costs which Gulf utilized in calculating the maximum permissible prices of the refined petroleum products that it sold. The disallowance proceeding concerned the manner in which Gulf established the cost of crude oil purchased in transactions with Gulf affiliates.[1]

In general, the price rule applicable to refiners provided that a refiner could not charge a price for an item which exceeded the weighted average price at which the item was lawfully charged in transactions with the class of purchaser concerned on May 15, 1973, "plus increased product costs incurred between the month of measurement and the month of May 1973 and measured pursuant to the provisions of section 212.83." 10 CFR 212.82(b)(1) (1974).[2] Increased product costs, such as increased transfer costs of crude oil, were placed in a pool of costs which could then be utilized by the refiner in the manner specified in section 212.83. Section 212.83 in general required an equal allocation of those costs to several broad product categories and among classes of purchasers for each product within a category. Each refiner, however, was given considerable discretion with regard to the manner in which it distributed increased costs among products within a single category, and was also permitted in some instances to transfer costs from one category to another. Furthermore, a refiner was not required to recover all increased product costs in the first period in which they were available for recovery under section 212.83, but could instead "bank" some of those costs for recovery in subsequent periods. A refiner was thus left a considerable amount of discretion in deciding when to pass through costs as well. The discretion given refiners under the refiner price rule thus makes it most difficult to determine with any degree of certainty the maximum price that could have been established for a Gulf product if the firm had appropriately calculated its imported oil costs.

A further problem in determining the precise amount of an overcharge to a particular

---

[1] Various aspects of the crude oil transfer pricing program have been discussed in several DOE Freedom of Information Act proceedings. See, e.g., *Kerr-McGee Corp.; Standard Oil Co. (Indiana),* 1 DOE Par. 80,155 (December 15, 1977); *Gulf Oil Corp.,* 1 DOE Par. 80,103 (October 7, 1977); *Sun Co., Inc.,* 4 FEA Par. 80,573 (November 19, 1976); *Sun Oil Co.,* 3 FEA Par. 80,528 (December 11, 1975). The program prescribes the standards which refiners are required to use in establishing the cost of imported crude oil purchased in transactions between affiliated entities and the standards which the DOE shall use to disallow or to reallocate landed costs pursuant to 10 CFR 212.83(b).

[2] 39 FR 42,368 (December 5, 1974). Prior to January 15, 1974, the refiner price rule was set forth in 6 CFR 150.355(b), and prior to November 1, 1973 in 6 CFR 150.358(a).

purchaser of Gulf products arises because many purchasers did not buy those products directly from Gulf, but bought them instead from independent resellers. A reseller may not have been required to pass through cost reductions to its customers under the reseller price provisions of the mandatory petroleum price regulations, or it may have been required to pass through only a portion of the reduction. Furthermore, regardless of the requirements of the regulations, a reseller may have voluntarily chosen to pass through all or part of any reduction in its product costs, either to meet the prices charged by competitors, or pursuant to contractual provisions, or simply as a customary practice.

While it is unquestionably difficult to determine the exact amount by which any particular purchaser was overcharged, it is nonetheless most likely that, as a class, purchasers of Gulf products during the period in question were injured to some extent. As we stated in *Shell Oil Co.*, 3 FEA at 80,691, as a general matter "[t]he benefit of the remedial action should inure wherever possible to the category of purchaser that was overcharged." In order to do so in this case, certain presumptions will be made regarding the manner in which the disallowed costs were passed through by Gulf and the extent to which resellers incurred an injury as a result of Gulf's actions.

First, we have presumed that Gulf allocated the entire refund amount to the products it sold or used during the period in which it recognized the disallowed costs, namely during the period August 1, 1973 through January 31, 1976. We have also presumed that the costs were apportioned equally on a volumetric basis to all petroleum products which Gulf produced. We have not yet been provided conclusive data as to the total volume of petroleum products produced during the relevant period. However, the data presently available indicate that the total volume of petroleum products produced during the period was approximately 30,354,354,618 gallons. Consequently, we shall assume that the total amount of the overcharge was approximately $0.00139 per gallon ($42,240,000 ÷ 30,354,354,618 gallons).

The further presumption has been made that if Gulf had reduced its prices to resellers during the relevant period to reflect the transfer prices provided in section 212.84, each reseller would in turn have passed through 60 percent of the benefit of those price reductions to its own customers. Thus a conclusive presumption will be made that the maximum possible injury which a reseller who purchased directly from Gulf could sustain is the number of gallons purchased during the relevant period multiplied by the total refund per gallon of approximately $0.00139 multiplied by 40 percent.

Based on the presumptions previously discussed, the maximum refund amount that a reseller at the second level of distribution could be entitled to receive would be equal to the volume of petroleum products purchased during the relevant period × approximately $0.00139 (the per gallon refund amount) × 60 percent (the portion of the price reduction benefit which the primary level reseller would have passed through to the secondary reseller) × 40 percent (the amount of the price reduction benefit which the secondary reseller would have retained rather than passing through to its own cus-

tomers). In order to implement a claims procedure in an administratively feasible manner it will also be presumed that any reseller who did not purchase petroleum products directly from Gulf purchased the products at the second level of distribution.[3] The presumptions applied with regard to resellers are not rebuttable.

With respect to ultimate consumers, an initial rebuttable presumption will be made. It will be presumed that each consumer purchased petroleum products after two prior sales to resellers. That presumption may be rebutted by the presentation of alternative facts. Thus if a consumer demonstrates that he purchased products directly from Gulf during the August 1973 to January 1976 period, he will be entitled to a refund that is equal to approximately $0.00139 per gallon. A consumer that establishes that he purchased Gulf products from a reseller that purchased the products directly from Gulf will be entitled to a refund amounting to approximately $0.00139 per gallon × 60 percent. All other ultimate consumers will be entitled to a refund amounting to approximately $0.00139 per gallon × 36 percent (100 percent less the 40 percent retained by the reseller at the primary level less the 24 percent retained by the reseller at the secondary level).[4]

It is of course true that the use of these presumptions will only approximate actual behavior. However, for the reasons discussed above conclusive findings can not be made as to the precise amount a particular purchaser has been overcharged. It is simply not possible to ascertain the precise manner in which Gulf would have determined the prices of its products to a particular purchaser over a two-and-a-half-year period if it had in fact calculated its imported crude oil costs properly. In our view the presumptions which we have adopted represent the most appropriate method of disbursing the refund by Gulf. This procedure will result in refunds to purchasers in all Gulf customer categories and will serve to apportion the refund among all such customers in an equitable manner.

In apportioning refund amounts, a further allocation must be made. Under the ap-

[3] For purposes of the claims procedure, commissioned agents will not be considered to be resellers. Consequently, a firm or individual that purchased Gulf products from a commissioned agent of Gulf will be considered to have purchased the product from Gulf itself. Correspondingly, commissioned agents of Gulf will not be eligible for any portion of the refund amount.

[4] As stated above, the $0.00139 per gallon refund amount has been calculated on the basis of presently available production data. It appears that the stated quantity of 30,354,354,618 gallons of refined petroleum products during the period August 1, 1973 through January 31, 1976, does not include the petroleum products produced by Gulf during that period and retained for its own use. When a final calculation of the refund amount is made the production data will be increased by the volume of products which Gulf used for its own purposes. We do not, however, contemplate that the revised data will alter by a substantial amount the refund amount of $0.00139 per gallon. Thus, the typical consumer, who will be entitled to 36 percent of the total overcharge, will be able to obtain a potential refund of approximately $0.00050 per gallon ($0.00139 × 0.36).

plicable pricing rules, Gulf would have been required to apportion a certain part of its increased costs to exempt products. In addition, Gulf retained for its own purposes some of the petroleum products it refined. It would be anomalous for Gulf to be able to claim any portion of the refund amount for the products it used since the entire refund amount arose from alleged improper conduct by Gulf. With respect to exempt products, it is not theoretically possible for any customer to claim a refund based on an "overcharge" since Gulf could have charged any price it wished for those products. consequently, the refunds calculated on a per gallon basis and attributable to exempt products produced during the relevant period of time and products that Gulf used for its own purposes will be remitted to the United States Treasury.

#### IV. NO OTHER ADMINISTRATIVE REMEDY

Under the terms of the proposed consent order, Gulf will be deemed to have complied with the applicable regulations with respect to the alleged violations after it has paid the refund and complied with the other terms and conditions of the consent order. Therefore, the procedures set forth in the appendix to this Decision will be the only administrative remedy available to persons injured as a result of the alleged violations by Gulf of the transfer pricing regulations. No further DOE compliance proceeding will be instituted against Gulf with regard to these matters.

However, neither the consent order nor the administrative remedy that appears in the appendix to this decision is designed to affect any right that person might have to obtain a refund from Gulf for past overcharges outside the administrative context. Consequently, the failure of any person to file an application for a refund under the procedures set forth in the Appendix, or the denial of all or part of his claim, will not affect his right to seek damages or obtain any other remedy through a judicial action.

Finally, it should be noted that the procedures set forth in the appendix require that all applications for refund be filed within 90 days of the date of issuance of the final procedures. This provision appears necessary in order to insure that all applications are considered and all refunds made in an expeditious manner. It is also our expectation that the entire claims procedures will, if possible, be completed and refunds made to eligible customers of Gulf within 6 months of the publication of a final decision and order.

It is therefore ordered that: The procedures set forth in the appendix to this decision are hereby adopted by the Department of Energy.

Date: August 22, 1978.

MELVIN GOLDSTEIN
*Director,*
*Office of Hearings and Appeals.*

REFUND PROCEDURES

1. ESCROW ACCOUNT

The Department of Energy shall issue an order providing for the establishment of an appropriate interest-bearing escrow account into which shall be placed the funds remitted by Gulf Oil Corp. pursuant to the issuance in final form of a proposed consent order (the "consent order") that the Office of Special Counsel of the Department of Energy published for comment on July 28,

1978 Funds shall be disbursed from the escrow account by the escrow agent only upon receipt of an order signed by the Director of the Office of Hearings and Appeals or his designee.

### 2. NOTICE

The Office of Hearings and Appeals shall publish an appropriate notice describing the procedures which shall be available to persons who wish to obtain a refund based on the consent order. A notice of this type shall be published in the FEDERAL REGISTER and in such other manner as the Office of Hearings and Appeals deems necessary or desirable. Other methods of publication may include advertisements in major newspapers and trade journals, direct mailings to certain Gulf customers and to trade and professional associations, and press releases.

### APPLICATION FOR REFUND; FILING

Any person who believes that he has been injured as a direct result of the pricing practices upon which the consent order was based may file an application for refund with the Office of Hearings and Appeals of the Department of Energy, 2000 M Street NW., Washington, D.C. 20461. All applications must be filed in duplicate, signed by the applicant and clearly labeled "application for refund—Gulf Oil Corp. consent order No. NOOROOOO7." All applications will be available for public inspection in the DOE Public docket Room at 2000 M Street, NW., Washington, D.C. Any applicant who believes that his application contains confidential information must so indicate on the first page of his application and submit two additional copies of his application from which the information that the claims is confidential has been deleted. A statement must also be provided specifying why any such information is privileged or confidential.

### FILING DEADLINE

An application for refund must be filed on or before the date that the Department of Energy specifies in the notices issued pursuant to section 2. The filing deadline shall not be less than 90 days from the date of publication of the notice in the FEDERAL REGISTER, the Office of Hearings and Appeals or its designee may grant extensions of time, for good cause shown, of the deadline. Requests for extension must be in writing and submitted prior to the deadline.

### 5. CONTENTS OF APPLICATION

An application shall contain a a full and complete statement of all relevant facts pertaining to the claim, including:

(a) The name of the applicant;

(b) His address;

(c) His telephone number;

(d) A complete statement of the basis for the claim (including the applicant's Gulf acount number and other identifying formation);

(e) The total quantity of covered petroleum products purchased from Gulf or from a reseller of Gulf products during the period August 1, 1973 through January 31, 1976;

(f) with respect to each type of product, the quantities and periods of time during which the purchases were made;

(g) Copies of all receipts, invoices, contracts, agreements, instruments or other documents necessary to establish the validity of the claim, including documents necessary to prove the quantities of covered Gulf petroleum products purchased during the period August 1, 1973 through January 31, 1976;

(h) A statement of whether the applicant has ever filed with the Department of Energy any other application for refund involving Gulf products and whether he is currently or has been a party in any court proceeding involving alleged crude oil pricing violations by Gulf; and

(i) A notarized declaration by the applicant that all statements made in the application are true and correct to the best of the applicant's knowledge and belief.

### 6. CRITERIA FOR EVALUATION

(a) An application for refund may be granted if an applicant has persuasively demonstrated (i) that he was in fact injured as a result of the alleged pricing practices upon which the consent order was based, and (ii) the nature and extent of the injury.

(b) In determining the amoung of injury to any direct or indirect purchaser of covered products from Gulf, the Office of Hearings and Appeals or its designee shall utilize the following presumptions:

(i) The $42,240,000 which Gulf is required to remit pursuant to the consent order represents costs that were applied evenly by Gulf on a volumetric basis to all refined petroleum products and residual fuel oil it produced, and that the prices of products sold by Gulf reflected those costs during the combined periods specified in the consent order, i.e. August 1, 1973 through January 31, 1976.

(ii) All refined petroleum products and residual fuel oil sold by Gulf passed through two levels of distribution before being purchased by a consumer, and

(A) A reseller at the first level of distribution, i.e. one who purchased directly from Gulf, was injured to the extent of 40 percent of the total overcharge,

(B) A reseller at the second level of distribution, i.e. one who purchased Gulf products from another reseller, was injured to the extent of 40 percent of the remaining overcharge, or 24 percent of the total overcharge, and

(C) A consumer of products produced by Gulf was injured to the extent of the remaining portion of the total overcharge, or 36 percent.

The presumptions stated in section 6(b)(i) and 6(b)(ii)(A) and (B) shall be regarded as conclusive. The presumption stated in section 6(b)(ii)(C) may be rebutted by the presentation of persuasive evidence.

### 7. PROCESSING OF APPLICATION

(a) The Office of Hearings and Appeals or its designee may initiate an investigation of any statement made in an application and may require verification of any document submitted in support of a claim. The Office of Hearings and Appeals or its designee may solicit and accept submissions from third parties, including Gulf Oil Corp. and the Office of Special Counsel, relevant to any application. In evaluating an application, the Office of Hearings and Appeals or its designee may consider information obtained from any other source and may on its own initiative convene a hearing or conference if, it its discretion, it decides that a hearing or conference will advance its evaluation of an application.

(b) The Director of the Office of Hearings and Appeals or his designee shall conduct any hearing or conference that is convened with respect to an application for refund and will specify the time and place for the hearing or conference and notify the applicant The official conducting the hearing may administer oaths and affirmations, rule on the presentation of information, receive relevant information, dispose of procedural requests, determine the format of the hearing, and otherwise regulate the course of the hearing.

### 8. DECISION OF THE DEPARTMENT OF ENERGY

Upon consideration of the application and other relevant information received or obtained during the course of the proceeding, the Office of Hearings and Appeals or its designee shall issue an order granting or denying the application. The order shall contain a concise written statement of the relevant facts and the legal basis for the order. A copy of the order, with such modification as is necessary to ensure the confidentiality of information protected from public disclosure by 18 U.S.C. 1905, shall be served upon the applicant and any person who participated in the proceeding.

### 9. EFFECT OF FAILURE TO FILE APPLICATION FOR REFUND

Any application not filed on a timely basis may be summarily dismissed, and the applicant shall not be entitled to any portion of the funds submitted pursuant to the consent order.

### 10. ADDITIONAL PARTIES

Gulf Oil Corp. and the Office of Special Counsel shall be deemed to be parties to all proceedings concerning applications for refund. Gulf will assist in the evaluation of applications for refund by submitting any documents or information that the Office of Hearings and Appeals or its designee determines is relevant to its evaluation of a claim. An applicant may submit to the Office of Hearings and Appeals a request that information or documents believed to be in the possession of Gulf Oil Corp. and necessary to the evaluation of his claim be furnished to him. The Office of Hearings and Appeals or its designee may issue an order granting the request if it determines that the requester seeks relevant and material evidence.

### 11. LIMITATIONS

(a) The aggregate amount of all refunds authorized by the Office of Hearings and Appeals shall not exceed the amount to be remitted to the Department of Energy by Gulf Oil Corp., plus interest accrued in the escrow account, reduced by any administrative costs authorized by the Office of Hearings and Appeals. In the event that the aggregate amount of the claims filed exceeds the amount remitted by Gulf, the Office of Hearings and Appeals may award refunds to applicants on a pro rata basis. The Office of Hearings and Appeals may delay payment of any refunds until all applications have been processed.

(b) A claim by an individual consumer will not be processed if it amounts to less than $5. A claim by a business consumer or reseller will not be processed if it amounts to less than $100.

(c) No entity owned or controlled by Gulf Oil Corp. shall be eligible for a refund.

(d) The portion of the total refund attributable to exempt products sold by Gulf during the period August 1, 1973 to January 31, 1976, and to products which Gulf produced during that period but did not sell, shall be remitted to the United States Treasury. The Office of Hearings and Appeals shall issue an appropriate order effectuating this provision.

### 12. INTERIM AND ANCILLARY ORDERS

The Director of the Office of Hearings and Appeals or his designee may issue any interim or ancillary orders, or make any rulings or determinations necessary to ensure that the refund proceedings, including the operations of the administrator and escrow agent appointed in connection with these proceedings, are conducted in an appropriate manner and are not unduly delayed.

### 13. REMAINING FUNDS

Any funds, including any accumulated interest, remaining in the escrow account after the disposition of all timely applications for refund and approved expenses of administering the refunds shall be remitted to the United States Treasury. The Director of the Office of Hearings and Appeals shall issue an order to the escrow agent directing him to disburse the funds in this manner.

[FR Doc. 78-24180 Filed 8-24-78; 8:45 am]